D. Lamar Hawkins (013251)
**Guidant Law, PLC**
**402 E. Southern Ave.**
**Tempe, AZ 85282**
**Telephone: (602) 888-9229**
**Facsimile: (480) 725-0087**
lamar@guidant.law
*Counsel for Debtors*

Craig Solomon Ganz (023650)
Katherine Anderson Sanchez (030051)
**Ballard Spahr LLP**
**1 E. Washington Street, Suite 2300**
**Phoenix, AZ 85004-2555**
ganzc@ballardspahr.com
andersonsanchezk@ballardspahr.com
**Telephone:    602.798.5400**
**Facsimile:    602.798.5595**
*Attorneys for the Joint Committee of Unsecured Creditors*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| *In re:* | Chapter 11 Proceedings |
| HOTEL OXYGEN MIDTOWN I, LLC, a Delaware limited liability company, | Case No. 2:19-bk-14399-PS<br>Case No. 2:19-bk-14400-PS<br>Case No. 2:19-bk-14401-PS<br>Case No. 2:19-bk-14402-PS<br>Case No. 2:19-bk-14403-PS |
| Debtor. | |
| HOTEL OXYGEN PALM SPRINGS, LLC, an Arizona limited liability company, | (This filing relates to HOMS and AGHA) |
| | **APPLICATION FOR ORDER TO SHOW CAUSE WHY LE GARDEN HB, LLC SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH PURCHASE AGREEMENT AND SALE ORDER AND MOTION TO COMPEL ASSUMPTION AND ASSIGNMENT TO LE GARDEN HB, LLC** |
| Debtor. | |
| OXYGEN HOSPITALITY GROUP, INC., a Delaware corporation. | |
| Debtor. | |
| | **ALTERNATIVE MOTION TO REJECT WYNDHAM GARDEN HOTEL FRANCHISE AGREEMENT** |
| A GREAT HOTEL COMPANY ARIZONA, LLC, an Arizona limited liability company, | |
| Debtor. | |
| A GREAT HOTEL COMPANY, LLC, a Delaware limited liability company, | |
| Debtor. | |

Hotel Oxygen Midtown I, LLC ("**HOMS**") and A Great Hotel Company Arizona, LLC ("**AGHA**" and collectively with HOMS the "**Debtors**") and the Official Joint Committee of Unsecured Creditors (the "**Committee**" and together with the Debtors "**Movants**") appointed in the jointly administered Chapter 11 bankruptcy cases of the above captioned Debtors, request the Court to direct Le Garden HB, LLC ("**Le Garden**") and its principal Brent Lee ("**Lee**") to appear and show cause why they should not be held in contempt for knowingly and willfully violating the terms of the Court's *Order Granting Second Motion to Approve Purchase Contract and Authorize Sale of Real Property Free and Clear of Liens, Claims and Interests* ("**Sale Order**") (DE #314) and failing to comply with the requirements of the underlying *Agreement of Purchase and Sale* dated March 23, 2020 and together with all amendments ("**Purchase Agreement**"), attached hereto as **Exhibit A** and ordering the assumption and assignment of the Wyndham Garden Hotel Franchise Agreement (the "**Agreement**") between Wyndham Franchisor, LLC ("**Wyndham**") and HOMS dated March 15, 2019 to Le Garden effective as of the date of the closing of the Sale. Alternatively, the Movants request an order rejecting the Agreement effective as of the date of the closing of the Sale and ordering that Le Garden and Lee immediately pay any rejection damages and related costs and attorneys' fees of the Movants.

In the Sale Order, the Court expressly found that Le Garden was substituted as the purchaser of the Wyndham Garden Phoenix Midtown and all related assets as set forth in the Purchase Agreement. Sale Order at ¶ D. Despite having full knowledge of the terms of the Purchase Agreement and participating in hearings prior to entry of the Sale Order, Le Garden and Lee have failed to complete the documents necessary to culminate the assignment of the Agreement. Movants respectfully request entry of an Order setting a hearing, on an expedited basis, requiring Le Garden and Lee to appear and show cause for their failure to comply with the Sale Order. Movants further ask that the Court consider all available means to compel compliance with the Sale Order including, but not limited to, monetary sanctions and entry of an Order approving the assumption and assignment of the

2

Agreement to Le Garden. This Application is supported by the simultaneously filed Motion for Expedited Hearing, the record in this case and the following Memorandum of Points and Authorities.

## Memorandum of Points and Authorities

### A. Jurisdiction & Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 105(a) and § 363.

### B. Relevant Factual Background

1. On November 12, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

2. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3. On December 23, 2019, the Office of the United States Trustee appointed the Committee.

4. On March 24, 2020, the Debtors filed a *Motion to Approve Sale Contract and Authorize Sale of Real Property Free and Clear of Liens, Claims and Interests* (the "**First Sale Motion**"). (DE #190) Through the First Sale Motion, the Debtors proposed to sell the Hotel to Amazing Hospitality Group ("Buyer"), subject to higher and better offers.

5. Attached to the First Sale Motion as Exhibit A was the *Agreement of Purchase and Sale* dated March 23, 2020 (the "**Sale Agreement**") between HOMS and Buyer. (DE #190-1) On May 15, 2020, the Debtor and Buyer executed the *Amendment to Agreement of Purchase and Sale* ("**First Amendment**"). (DE #240)

6. On July 1, 2020, HOMS and Buyer entered in to that *Second Amendment to Agreement of Purchase and Sale* (the "**Second Sale Amendment**"). (DE #250-4) The Second Sale Amendment reduced the purchase price to $2,300,000 and agreed to close the

Case 2:19-bk-14399-PS    Doc 336    Filed 09/10/20    Entered 09/10/20 15:37:42    Desc
Main Document    Page 3 of 106

1   sale by June 30, 2020 but did not materially alter Buyer's obligations under the Purchase
2   Agreement.   On July 7, 2020, the Debtors filed a *Second Motion to Approve Purchase*
3   *Contract and Authorize Sale of Real Property Free and Clear of Liens, Claims and Interests*
4   ("**Second Sale Motion**"). (DE #250)

5       7.      The Court held a hearing on the Second Sale Motion on July 16, 2020 and
6   July 28, 2020 (the "**Sale Hearings**").

7       8.      At the Sale Hearing on July 28, 2020, Le Garden appeared, through counsel,
8   and offered to be substituted as the Buyer under the Purchase Agreement. Le Garden was
9   substituted pursuant to the Sale Order. Accordingly, Le Garden is bound by the obligations
10  and enjoys the benefits of the Purchase Agreement. The sale was to close by July 31, 2020,
11  but due to failures to timely act by Le Garden and Lee, the sale did not timely close.  The
12  Debtors have incurred damages as a result of Le Garden and Lee's failure to timely act.

13      9.      On September 4, 2020, the sale to Le Garden closed because the Debtors
14  worked around Le Garden's failures to timely act (the "**Closing Date**").  The Debtors made
15  demand on Le Garden and Lee with respect to their failure to timely act, including, but not
16  limited to the necessary assumption and assignment of the Agreement.  See demand letter
17  attached as **Exhibit B**.  To date, Le Garden has failed to perform the necessary acts to
18  receive the assumption and assignment of the Agreement and has refused to communicate
19  with counsel for the Wyndham with respect to the assignment of the Agreement.  Thus, the
20  Debtors, the Committee, and Wyndham do not even know of any reason by Le Garden and
21  Lee that they have failed to timely act with respect to the Agreement.  As a result, Le Garden
22  and Lee are presently using the benefits of the Agreement as they continue to hold the Hotel
23  out as a "Wyndham" without proper authority.  Wyndham has made it clear that it is not
24  waiving the rights it has to file a claim against the estate for Le Garden and Lee's failure to
25  timely act, and does not wish to assume the collection risk of chasing the Buyer for
26  reimbursement if ultimately the Buyer does not assume the Agreement.  Thus, the Debtors
27  have claims against Le Garden and Lee for any damages associated with Wyndham.
28  Wyndham will likely issue a cease and desist letter to Le Garden and Lee concerning their

4

ongoing use of Wyndham's trademarks without proper authority.

10. In the Purchase Agreement, Buyer promised to "assume as of the Closing the Assumed Contracts." The Assumed Contracts were listed on Schedule 1.1(a) and include the ground lease with Talisker Second Osborn, LLC ("Landlord") and the franchise agreement with Wyndham Franchisor, LLC. *See* Purchase Agreement at § 1.1. The ground lease was assumed and assigned to the Buyer as of the Closing. For inexplicable reasons, the Buyer has failed to perform with respect to the Agreement.

## C. Legal Argument

This Court is vested with both statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code and to make "any determination necessary or appropriate to enforce or implement court orders" 11 U.S.C. § 105(a) and with the inherent authority to impose sanctions on any party acting in bad faith. *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine)*, 77 F.3d 278, 283 (9th Cir. 1996). Civil contempt sanctions are appropriate to "coerce the defendant into compliance" with a court order. *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801 (2019).

The standard for evaluating whether a party is in contempt of a court order is an objective one. *Id*. at 1804. A person may be held in civil contempt for failing "to take all reasonable steps within the party's power to comply" with the relevant court order. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993); *see also Bateman v. GemCap Lending I, LLC*, 2019 Bankr. LEXIS 2453 *13 (9th Cir. BAP 2019) (affirming an order of contempt where contemnors failed to take active steps to comply with court order). Whether the contemnor violated a court order is not based on subjective beliefs or intent in complying with the order, but based on whether the conduct in fact complied with the order at issue. *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003) (internal citations omitted).

To find a party in civil contempt, the movant must provide by clear and convincing evidence that the alleged contemnor violated a specific and definite order of the court.

Further, the contemnor must have had sufficient notice of the order's terms and the fact that sanctions would follow a failure to comply. *Hansbrough v. Birdsell (In re Hercules Enters., Inc.)*, 387 F.3d 1024, 1028 (9th Cir. 2004).

In the Sale Order the Court found that "[d]uring the July 28, 2020 hearing, counsel for the Debtors advised the Court that the Debtors were substituting Le Garden as the buyer of the Real Property and Related Assets....From the discussions of counsel at the hearing, the Court is satisfied that Le Garden was aware of the information and actions necessary to accomplish the assumption and assignment of the Ground Lease with Talisker and to obtain a franchise agreement with Wyndham." Sale Order at ¶ D. Despite this finding, and despite electing to be substituted as the Buyer, Le Garden and Lee have failed and refused to complete the required paperwork to consummate the assignment of the Agreement. Le Garden and Lee's refusal to fulfill their obligations under the Purchase Agreement as contemplated by the Sale Order are grounds to hold them in contempt of the Sale Order and to enter an order compelling Le Garden and Lee to comply with the same and to compensate the Debtors for their damages and the Debtors and the Committee for their attorneys' fees in bringing this issue to the Court.

The sale of the hotel to Le Garden closed on September 4, 2020. However, as of the Closing, neither Le Gardens nor Lee had taken the necessary steps to obtain an assignment of the Agreement. The remaining action is the signing of documents Wyndham provided to Lee and Le Garden well before the Closing, yet Lee and Le Garden had not signed, thus Wyndham would not authorize the Debtors to lodge the separate order concerning the assumption/assignment of the Agreement. This lack of action, as opposed to affirmative action, is nonetheless contemptuous. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 693; *see also Bateman v. GemCap Lending I, LLC*, 2019 Bankr. LEXIS 2453. Failure to take actions mandated by an order can also be acts of contempt under the Order. Le Garden and Mr. Lee are ignoring their obligation under the Purchase Agreement and the Sale Order. Despite efforts by the Debtors' counsel, the Committee's counsel, and Wyndham's counsel to engage with Lee and Le Garden through their counsel,

they have refused to engage in a discussion on these issues. Accordingly, Movants must come to the Court and yet again ask the Court to intervene and hold a hearing where Le Garden and Lee must be required to appear and show cause, if any, why they have failed to perform their obligations under the Sale Order and the Purchase Agreement.

In the event Le Gardens and Lee fail to show cause for their contemptuous acts, Movants ask that the Court enter an Order sanctioning Le Garden and Lee in a monetary amount sufficient to compensate Movants for any amounts that will be due to Wyndham from and after the Closing. In the event Le Garden and Lee further refuse to obtain an assignment of the Agreement, the Debtor will be obligated to reject the Agreement as of the Closing.

An executory contract is one under which performance remains due to some extent on both sides and the failure of either party to complete performance would constitute a material breach and excuse performance of the other. *In re Boats*, 551 B.R. 428, 434 (B.A.P. 9th Cir. 2016). In Chapter 11 cases, an executory contract may be rejected at any time before the confirmation of a plan, subject to the Court's approval. 11 U.S.C. § 365(a) & (d)(2). The rejection of an executory contract constitutes a breach of such contract. *Id.* at (g).

If Le Garden and Lee continue to fail and refuse to perform the necessary assumption and assignment of the Agreement, the Debtors request that the Agreement be deemed rejected as of the Closing. Movants request that the Court enter an Order sanctioning Le Garden and Lee in an amount equal to any amounts that will be claimed by Wyndham for rejection damages, any damages incurred by the Debtors or the Committee for Le Garden and Lee's failure to perform, any amounts due after the Closing, and Movants further request an award of attorneys' fees and costs incurred by them in bringing this Application and Motion.

WHEREFORE, based on the foregoing, Movants respectfully request that the Court set a hearing on this Application and direct Le Garden and Lee to appear and show cause, if any, why they should not be held in contempt for violating the Sale Order.

RESPECTFULLY SUBMITTED this 10th of September, 2020.

GUIDANT LAW, PLC

By:/s/ D. Lamar Hawkins, #013251
D. Lamar Hawkins
402 East Southern Avenue
Tempe, AZ 85282
Counsel for Debtors

BALLARD SPAHR LLP

By: /s/ Katherine Anderson Sanchez
Craig S. Ganz (023650)
Katherine Anderson Sanchez (030051)
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
ganzc@ballardspahr.com
andersonsanchezk@ballardspahr.com
Telephone: 602.798.5400
Facsimile: 602.798.5595
*Attorneys for The Joint Committee of Unsecured Creditors*

COPY of the foregoing mailed, or served
via electronic notification* or fax** if so marked,
this 10th day of September, 2020, to:

U.S. Trustee's Office* ustpregion14.px.ecf@usdoj.gov
Christopher J. Pattock* christopher.j.pattock@usdoj.gov
230 N. First Ave., Ste. 204
Phoenix, AZ 85003-1706

Wesley D. Ray* wesley.ray@sackstierney.com
Michael Galen* michael.galen@sackstierney.com
SACKS TIERNEY, PA
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251
*Attorneys for O2 Investments, Inc.*

Anthony W. Austin* aaustin@fclaw.com
Phil Brailsford* pbrailsford@fclaw.com
FENNEMORE CRAIG, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, AZ 85016
*Attorneys for Talisker Second Osborn, LLC.*

Steven J. Brown* sbrown@sjbrownlaw.com
Steve Brown & Associates, LLC
1414 E. Indian School, Suite 200
Phoenix, AZ 85014
*Attorneys for Downtown Associates, LLC*

Daniel M. Eliades* daniel.eliades@klgates.com
David S. Catuogno* David.catuogno@klgates.com
Caitlin C. Conklin* Caitlin.conklin@klgates.com
K&L Gates, LLP
One Newark Center, Tenth Floor
1085 Raymond Boulevard
Newark, NJ  07102-5285
*Attorneys for Wyndham Franchisor, LLC*

Kasey C. Nye* knye@waterfallattorneys.com
Cindy K. Schmidt* cschmidt@waterfallattorneys.com
Waterfall, Economidis, Caldwell, Hanshaw
        & Villamana, P.C.
5210 E Williams Circle, Suite 800
Tucson, AZ 85711
*Attorneys for Profectus Wealth Management
        Company Noteholders*

Patrick F. Keery* pfk@keerymccue.com
Keery McCue, PLLC
6803 East Main Street, Suite 1116
Scottsdale, AZ 85251
*Attorneys for Orion Atlantic Hotels Corp., Oxygen
        Hotels International, LLC and Midtown
        Center Properties, LLC*

Catherine E. Youngman* cyoungman@foxrothschild.com
Fox Rothschild, LLP
49 Market Street
Morristown, NJ 07960
*Attorneys for Alan Walkow*

Mark Melzer* mmelzer@mdrarchitects.com
Melzer Deckert & Ruder Architects, Inc.
9511 Irvine Center Drive
Irvine, CA 92618
*Joint Committee of Unsecured Creditors*

Roberto Hernandez* hskstaffing2013@gmail.com
HSK Staffers, LLC
PO Box 134
Glendale, AZ 85311
*Joint Committee of Unsecured Creditors*

Ruth Seigel* rsmarketingandpr@gmail.com
RS Marketing Assoc.
24801 N. 84th Street
Scottsdale, AZ 85255
*Joint Committee of Unsecured Creditors*

9

| | |
|---|---|
| 1 | Katherine Anderson Sanchez* andersonsanchezk@ballardspahr.com |
| | Ballard Spahr, LLP |
| 2 | 1 East Washington St., Suite 2300 |
| | Phoenix, AZ 85004 |
| 3 | *Attorney for the Official Joint Committee* |
| | *Of Unsecured Creditors* |
| 4 | |
| | Dean M. Dinner* dean.dinner@kutakrock.com |
| 5 | Kutak Rock, LLP |
| | 8601 N. Scottsdale Rd., Suite 300 |
| 6 | Scottsdale, AZ 85253 |
| | *Attorneys for ONETIJ, INC.* |
| 7 | Caroline R. Djang* caroline.djang@bbklaw.com |
| | BEST BEST & KRIEGER, LLP |
| 8 | 18101 Von Karman Ave., Ste 1000 |
| | Irvine, CA 92612 |
| 9 | *Attorneys for The City of Palm Desert* |
| 10 | William G. Klain* wklain@lang-klain.com |
| | LANG & KLAIN, P.C. |
| 11 | 6730 N. Scottsdale Road, Suite 101 |
| | Scottsdale, AZ 85253 |
| 12 | |
| | Peter Muthig* muthigk@mcao.maricopa.gov |
| 13 | Maricopa County Attorney's Office |
| | Civil Services Division |
| 14 | 225 W. Madison Street |
| | Phoenix, Arizona 85003 |
| 15 | *Attorneys for Maricopa County Treasurer* |
| 16 | Jerome K. Elwell* jelwell@warnerangle.com |
| | James Valletta* jvalletta@warnerangle.com |
| 17 | Tara C. Nordquist* tnordquist@warnerangle.com |
| | Warner Angle Hallam Jackson & Formanek, PLC |
| 18 | 2555 E. Camelback Rd., Suite 800 |
| | Phoenix, AZ 85016 |
| 19 | *Attorneys for Le Garden HB, LLC* |
| 20 | Alan A. Meda* ameda@bcattorneys.com |
| | Burch & Cracchiolo, PA |
| 21 | 702 E. Osborn Rd., Suite 200 |
| | Phoenix, AZ 85014 |
| 22 | *Attorneys for Brent Lee and Le Garden HB, LLC* |
| 23 | Yaron Askenazi* yaron.ashkenazi1964@gmail.com |
| | 27962 N 64th Place |
| 24 | Scottsdale AZ 85266 |
| | *Shareholder* |
| 25 | |
| | Merv Chai* mervchia1@gmail.com |
| 26 | 3600 N. 2nd Avenue |
| | Phoenix, AZ 85013 |
| 27 | *Shareholder* |
| 28 | |

10

Susan M. Freeman * sfreeman@lrrc.com
Scott K. Brown, * sbrown@lrrc.com
Lewis Roca Rothgerber Christie LLP
201 E. Washington, Ste 200
Phoenix, Arizona 85004
*Attorneys for Amazing Hospitality Group, LLC*

/s/ Heidi Scheving-Nelson

**EXHIBIT "A"**

**AGREEMENT OF PURCHASE AND SALE**

by and among

HOTEL OXYGEN MIDTOWN I, LLC, as Seller

and

AMAZING HOSPITALITY GROUP, LLC, as Buyer

Dated as of March 23, 2020

Wyndham Garden Midtown Phoenix

# TABLE OF CONTENTS

ARTICLE I      DEFINITIONS ................................................................................................ 1

     Section 1.1      Defined Terms ................................................................. 1

ARTICLE II      SALE, CONSIDERATION AND CLOSING ........................................... 10

     Section 2.1      Sale of Assets ................................................................. 10

     Section 2.2      Purchase Price ................................................................ 12

     Section 2.3      The Closing .................................................................... 13

     Section 2.4      Allocated Purchase Price ............................................... 14

ARTICLE III      REPRESENTATIONS, WARRANTIES AND CERTAIN COVENANTS OF SELLER ................................................................ 14

     Section 3.1      General Seller Representations and Warranties ............. 14

     Section 3.2      Representations and Warranties of Seller as to the Assets ................ 15

     Section 3.3      Amendments to Schedules; Limitations on Representations and Warranties of Seller ................................................ 16

     Section 3.4      Covenants of Seller Prior to Closing ............................ 17

     Section 3.5      Covenants of Buyer ....................................................... 19

ARTICLE IV      REPRESENTATIONS, WARRANTIES AND CERTAIN COVENANTS OF BUYER ................................................................ 20

     Section 4.1      Representations and Warranties of Buyer ...................... 20

ARTICLE V      CONDITIONS PRECEDENT TO CLOSING ........................................ 21

     Section 5.1      Conditions Precedent to Seller's Obligations ................ 21

     Section 5.2      Conditions Precedent to Buyer's Obligations ................ 22

     Section 5.3      Waiver of Conditions Precedent .................................... 23

ARTICLE VI      CLOSING DELIVERIES ...................................................................... 23

     Section 6.1      Buyer Deliveries ............................................................ 23

     Section 6.2      Seller Deliveries ............................................................ 24

     Section 6.3      Cooperation .................................................................... 25

ARTICLE VII      INSPECTION ........................................................................................ 25

     Section 7.1      General Right of Inspection ........................................... 25

     Section 7.3      Examination; No Contingencies ..................................... 26

     Section 7.4      Release .......................................................................... 29

ARTICLE VIII      TITLE AND PERMITTED EXCEPTIONS ........................................... 30

     Section 8.1      Permitted Exceptions ..................................................... 30

Section 8.2      Title Commitment; Surveys ............................................................ 30

Section 8.3      Certain Exceptions to Title; Inability to Convey ............................. 31

Section 8.4      Title Policy ..................................................................................... 32

Section 8.5      Cooperation .................................................................................... 32

ARTICLE IX      TRANSACTION COSTS; RISK OF LOSS .................................. 32

Section 9.1      Transaction Costs ........................................................................... 32

Section 9.2      Risk of Loss ................................................................................... 33

ARTICLE X      ADJUSTMENTS .............................................................................. 34

Section 10.1      Fixed Rents and Additional Rents .................................................. 34

Section 10.2      Taxes and Assessments .................................................................. 36

Section 10.3      Utilities .......................................................................................... 36

Section 10.4      Contracts ........................................................................................ 36

Section 10.5      Miscellaneous Revenues ................................................................ 36

Section 10.6      Security Deposits ........................................................................... 36

Section 10.7      Leasing Costs ................................................................................. 36

Section 10.8      Accounts Receivable ...................................................................... 37

Section 10.9      Consumables .................................................................................. 38

Section 10.10      Accounts Payable ........................................................................... 38

Section 10.11      Bookings; Booking Deposits .......................................................... 38

Section 10.12      Sales, General Excise, Room and Occupancy Taxes ....................... 38

Section 10.13      Retail Merchandise ........................................................................ 39

Section 10.14      Association Fees ............................................................................. 39

Section 10.15      Other Adjustments ......................................................................... 39

Section 10.16      Benefit Plans; Employees. .............................................................. 39

Section 10.17      Re-Adjustment; Credits Against the Purchase Price ....................... 39

Section 10.18      Post-Closing Statement .................................................................. 40

ARTICLE XI      INDEMNIFICATION ...................................................................... 40

Section 11.1      Indemnification by Seller ............................................................... 40

Section 11.2      Indemnification by Buyer ............................................................... 40

Section 11.3      Limitations on Indemnification ...................................................... 40

Section 11.4      Survival ......................................................................................... 41

Section 11.5      Indemnification as Sole Remedy .................................................... 41

ARTICLE XII      TAX CERTIORARI PROCEEDINGS .......................................... 42

| Section 12.1 | Prosecution and Settlement of Proceedings | 42 |
| Section 12.2 | Application of Refunds or Savings | 42 |
| Section 12.3 | Survival | 42 |
| ARTICLE XIII | DEFAULT | 42 |
| Section 13.1 | Buyer Default | 42 |
| Section 13.2 | Seller Default | 43 |
| ARTICLE XIV | OTHER AGREEMENTS; EMPLOYEE MATTERS | 44 |
| Section 14.1 | Employee Matters | 44 |
| ARTICLE XV | MISCELLANEOUS | 45 |
| Section 15.1 | Exculpation | 45 |
| Section 15.2 | Brokers | 46 |
| Section 15.3 | Confidentiality; Press Release; IRS Reporting Requirements | 46 |
| Section 15.4 | Escrow Provisions | 47 |
| Section 15.5 | Successors and Assigns; No Third-Party Beneficiaries | 48 |
| Section 15.6 | Assignment | 48 |
| Section 15.7 | Further Assurances | 48 |
| Section 15.8 | Notices | 48 |
| Section 15.9 | Entire Agreement | 50 |
| Section 15.10 | Amendments | 50 |
| Section 15.11 | No Waiver | 50 |
| Section 15.12 | Governing Law | 50 |
| Section 15.13 | Submission to Jurisdiction | 50 |
| Section 15.14 | Severability | 50 |
| Section 15.15 | Section Headings | 50 |
| Section 15.16 | Counterparts | 51 |
| Section 15.17 | Construction | 51 |
| Section 15.18 | Acceptance of Deed | 51 |
| Section 15.19 | Recordation | 51 |
| Section 15.20 | Guest Baggage and Safe Deposit Boxes | 51 |
| Section 15.21 | Bulk Sales Laws | 52 |
| Section 15.22 | Survival | 52 |
| Section 15.23 | TIME IS OF THE ESSENCE | 52 |
| Section 15.24 | Waiver of Jury Trial | 52 |

<u>Schedules</u>

| | | |
|---|---|---|
| Schedule A | – | Property Legal Description (to be confirmed by the Title Company) |
| Schedule 1.1(a) | – | Assumed Contracts |
| Schedule 1.1(b) | - | Survey |
| Schedule 3.1(c) | – | Required Governmental Authority Consents |
| Schedule 3.1(d) | – | Required Third-Party Consents |
| Schedule 3.2(a) | – | Material Contracts |
| Schedule 3.2(b) | – | Space Leases |
| Schedule 3.2(d) | – | Litigation |

<u>Exhibits</u>

| | | |
|---|---|---|
| Exhibit A | – | Form of Assignment and Assumption of Contracts, Bookings, Licenses, Permits, Warranties, and General Intangibles |
| Exhibit B | -- | Contracts to be Assumed by Buyer |
| Exhibit C | – | Tenant Notices |
| Exhibit D | – | Form of Assignment and Assumption of Land Lease |
| Exhibit E | – | Form of Bill of Sale |

# AGREEMENT OF PURCHASE AND SALE

AGREEMENT OF PURCHASE AND SALE (this "<u>Agreement</u>"), made as of the 23rd day of March , 2020, by and between HOTEL OXYGEN MIDTOWN I, LLC, a Delaware limited liability company ("<u>Seller</u>"), and AMAZING HOSPITALITY GROUP, LLC, an Oregon limited liability company ("<u>Buyer</u>"), or Assignee.

## Background

A.      Seller is the owner of the ground lease, building, parking garage, and other improvements constituting the "Property" commonly known as the "*Wyndham Garden Midtown Phoenix*" located at 3600 N 2nd Avenue Phoenix, AZ 85013 and more particularly described on <u>Schedule A</u> attached hereto and made a part hereof (the "<u>Property</u>"; the Property together with the Asset-Related Property (as defined below), collectively, the "<u>Assets</u>").

B.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Assets on the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1      <u>Defined Terms</u>.   The capitalized terms used herein will have the following meanings.

"<u>Accounts Payable</u>" means all accrued amounts owed by Seller as of the Cut-Off Time and arising out of the ownership and operation of the Property; <u>provided</u>, <u>however</u>, the term Accounts Payable does not include Booking Deposits.

"<u>Accounts Receivable</u>" means all accrued amounts owed to Seller as of the Cut-Off Time and arising out of the ownership or operation of the Property, whether or not past due and whether or not a bill or statement has been presented to the Person owing such amount, including the following: room, food and beverage charges; telephone or telecopy charges; valet charges; charges for other services or merchandise; charges for banquets, meeting rooms, catering and the like; sales, use and occupancy taxes due from the consumers of goods and services; amounts owed from credit card companies pursuant to signed credit card receipts, whether or not such credit card receipts have been delivered by Seller to the applicable credit card companies; but excluding deposits or prepayments made by or held for the account of Seller (including any utility deposits, and any deposits or prepayments made by a Manager for the account of Seller).

"<u>Additional Rent</u>" shall have the meaning assigned thereto in Section 10.1(a).

"Affiliate" shall mean any Person (as defined below) that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control of another Person. The term "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and shall in any event include the ownership or power to vote fifty percent (50%) or more of the outstanding equity or voting interests, respectively, of such other Person.

"Agreement" shall mean this Agreement of Purchase and Sale and all amendments hereto, together with the exhibits and schedules attached hereto, as the same may be amended, restated, supplemented or otherwise modified, from time to time.

"Allocated Purchase Price" shall have the meaning assigned thereto in Section 2.4.

"Applicable Law" means all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, board of fire underwriters and similar quasi-governmental agencies or entities, and any judgment, injunction, order, directive, decree or other judicial or regulatory requirement of any Governmental Authority of competent jurisdiction affecting or relating to the Person or property in question.

"Asset File" shall mean the materials with respect to the Assets delivered to Buyer or its representatives by or on behalf of Seller or made available to Buyer at the Property or on an online data website, which materials may include, but shall not be limited to, a current Smith Travel Report, Seller's title insurance policy, the Survey and environmental inspection reports.

"Asset-Related Property" shall have the meaning assigned thereto in Section 2.1(b).

"Assets" shall have the meaning assigned thereto in "Background" paragraph A.

"Assignment of Contracts, Bookings, Licenses, Permits, Warranties and General Intangibles" shall have the meaning assigned thereto in Section 6.1(b).

"Assignment of Leases" shall have the meaning assigned thereto in Section 6.1(a).

"Assumed Contracts" shall mean those Contracts which Buyer is either (i) required to assume or (ii) in its sole discretion, elects to assume. The Assumed Contracts that the Buyer is required to assume are listed on Schedule 1.1(a).

"Benefits Credit" shall have the meaning assigned thereto in Section 10.16.

"Bill of Sale" shall have the meaning assigned thereto in Section 6.2(e).

"Booking Deposit" shall mean all room reservation deposits, public function, banquet, food and beverage deposits and other deposits or fees for Bookings.

"Bookings" shall mean all bookings, reservations and agreements for guest, conference and banquet rooms or other facilities, if applicable, at the Property.

"Books and Records" shall have the meaning assigned thereto in Section 2.1(b)(ix).

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in Arizona and Delaware.

"Buyer" shall have the meaning assigned thereto in the Preamble to this Agreement.

"Buyer-Related Entities" shall have the meaning assigned thereto in Section 11.1.

"Buyer-Waived Breach" shall have the meaning assigned thereto in Section 11.3(a).

"Buyer's Consultant" shall have the meaning assigned thereto in Section 15.2(b).

"Buyer's Knowledge" shall mean the actual knowledge of Buyer based upon the actual knowledge of Jeff Fleming without any duty on the part of such Person to conduct any independent investigation or make any inquiry of any Person. None of the named individuals shall have any personal liability by virtue of their inclusion in this definition.

"Buyer's Leasing Costs" shall have the meaning assigned thereto in Section 10.7.

"CAM" shall have the meaning assigned thereto in Section 10.1(a).

"Cash on Hand" shall have the meaning assigned thereto in Section 2.1(c)(i).

"Claims" shall have the meaning assigned thereto in Section 7.4(a).

"Closing" shall have the meaning assigned thereto in Section 2.3(a).

"Closing Date" shall have the meaning assigned thereto in Section 2.3(a).

"Closing Documents" shall mean any certificate, assignment, instrument or other document delivered pursuant to this Agreement, including, without limitation, each of the documents to be delivered by Seller pursuant to Section 6.2 and by Buyer pursuant to Section 6.1.

"Closing Statement" shall have the meaning assigned thereto in Section 6.1(i).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any successor statute. Any reference herein to a particular provision of the Code shall mean, where appropriate, the corresponding provision in any successor statute.

"Condition of the Assets" shall have the meaning assigned thereto in Section 7.3(b).

"Consumables" shall have the meaning assigned thereto in Section 2.1(b)(iii).

"Contracts" shall mean, collectively, all agreements or contracts of Seller, or entered into on behalf of Seller, relating to the ownership, operation, maintenance and management the Property, or any portion thereof, but excluding the Bookings, the Booking Deposits, the Space Leases, the Terminated Contracts, the Franchise Agreement and the National Service Contracts.

"Cut-Off Time" shall have the meaning assigned thereto in the introductory paragraph to Article X.

"Deed" shall have the meaning assigned thereto in Section 6.2(a).

"Depositors" shall have the meaning assigned thereto in Section 15.19(b).

"Earnest Money" shall have the meaning assigned thereto in Section 2.2(a).

"Effective Date" shall mean the date this Agreement is fully executed by all parties.

"Employees" shall mean all individuals who are employed on a full-time or part-time basis at, or with respect to, the Property.

"Environmental Claims" shall mean any claim for reimbursement or remediation expense, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the presence or release of any Hazardous Materials over, on, in or under the Property, or the violation of any Environmental Laws with respect to the Property.

"Environmental Laws" means any Applicable Laws which regulate or control (i) Hazardous Materials, pollution, contamination, noise, radiation, water, soil, sediment, air or other environmental media, or (ii) an actual or potential spill, leak, emission, discharge, release or disposal of any Hazardous Materials or other materials, substances or waste into water, soil, sediment, air or any other environmental media, including, without limitation, (A) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), (B) the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA"), (C) the Federal Water Pollution Control Act, 33 U.S.C. § 2601 et seq., (D) the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., (E) the Clean Water Act, 33 U.S.C. § 1251 et seq., (F) the Clean Air Act, 42 U.S.C. § 7401 et seq., (G) the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq., and (H) the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. and similar state and local Applicable Law, as amended from time to time, and all regulations, rules and guidance issued pursuant thereto.

"Environmental Liabilities" means any liabilities or obligations of any kind or nature imposed on the Person in question pursuant to any Environmental Laws, including, without limitation, any (i) obligations to manage, control, contain, remove, remedy, respond to, clean up or abate any actual or potential release of Hazardous Materials or other pollution or contamination of any water, soil, sediment, air or other environmental media, whether or not

located on the Property and whether or not arising from the operations or activities with respect to the Property, and (ii) liabilities or obligations with respect to the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation of any Hazardous Materials.

"Escalation Rent" shall have the meaning assigned thereto in Section 10.1(a).

"Escrow Account" shall have the meaning assigned thereto in Section 15.4(a).

"Escrow Agent" shall have the meaning assigned thereto in Section 2.2(a)(i).

"Excluded Assets" shall have the meaning assigned thereto in Section 2.1(c).

"Excluded Personal Property" shall have the meaning assigned thereto in Section 2.1(c)(ii).

"Fixed Rents" shall have the meaning assigned thereto in Section 10.1(a).

"Franchise Agreement" means that certain Franchise Agreement dated March 15, 2019, between Seller and Franchisor.

"Franchisor" means, Wyndham Franchisor, LLC.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall have the meaning assigned thereto in Section 2.1(b)(iv).

"Governmental Authority" shall mean any federal, state, local or foreign government or other political subdivision thereof, including, without limitation, any agency, court or entity exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"Guest Ledger" means any and all charges accrued to the open accounts of any guests or customers at the Property as of the Cut-Off Time for the use and occupancy of any guest, conference, meeting or banquet rooms or other facilities at the Property, any restaurant, bar or banquet services, or any other goods or services provided to such guests or customers by or on behalf of Seller (or a Manager on behalf of Seller).

"Hazardous Materials" shall have the meaning assigned thereto in Section 7.3(b)(i).

"IRS" shall mean the Internal Revenue Service.

"IRS Reporting Requirements" shall have the meaning assigned thereto in Section 15.3(b).

"Leasing Costs" shall mean, with respect to a particular Space Lease, all capital costs, expenses incurred for capital improvements, equipment, painting, decorating, partitioning and other items to satisfy the construction obligations of the landlord under such Space Lease (including any expenses incurred for architectural or engineering services in respect of the foregoing), "tenant allowances" in lieu of or as reimbursements for the foregoing items, payments made for purposes of satisfying or terminating the obligations of the tenant under such Space Lease to the landlord under another lease (i.e., lease buyout costs), free rent periods, relocation costs, temporary leasing costs, leasing commissions, brokerage commissions, legal, design and other professional fees and costs, in each case, to the extent the landlord thereunder is responsible for the payment of such cost or expense under the relevant Space Lease or any other agreement relating to such Space Lease.

"Licenses and Permits" shall have the meaning assigned thereto in Section 2.1(b)(iv).

"Liens" means any mortgage, pledge, hypothecation, assignment, deposit, arrangement, encumbrance, lien (statutory or other), charge, security interest, option, restriction, arrangement, preference, priority or other security interest of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease or other arrangement having substantially the same effect as any of the foregoing.

"Losses" shall have the meaning assigned thereto in Section 11.1.

"Management Agreement" shall mean, with respect to the Property, that certain Management Agreement dated May 9, 2017, between Seller, as owner, and the Manager, as manager, for the management and operation of the Property, and all amendments and modifications thereto.

"Manager" shall mean A Great Hotel Company Arizona, LLC, a Delaware Limited Liability Company.

"Material Casualty" shall have the meaning assigned thereto in Section 9.2(b).

"Material Condemnation" shall have the meaning assigned thereto in Section 9.2(b)

"Material Contracts" shall mean all Contracts that either (i) are not terminable on 30 days' or less notice without cost or penalty or (ii) require the payment of more than $100,000 in any calendar year.

National Service Contracts" shall mean any Contract to which Seller, an Affiliate of Seller or the Manager is a party which provides for services to the Property, their Affiliates or Manager and other properties owned or managed by Seller, Manager or their Affiliates.

"New Lease" shall have the meaning assigned thereto in Section 3.4(e).

"OFAC" shall have the meaning assigned thereto in Section 3.1(f).

"Permitted Exceptions" shall mean all of the following: (i) Applicable Laws with respect to the Assets, (ii) the matters set forth on the Survey or discrepancies, conflicts in boundary lines, shortages in area, encroachments and any state of facts which an updated survey of the Property would disclose or which are not shown on the public records, (iii) the Liens, encumbrances, restrictions, exceptions and other matters set forth in the Title Commitment as exceptions or exclusions from coverage which have been approved or waived by Buyer or deemed Permitted Exceptions pursuant to the process set forth in Section 8.2 of this Agreement, (iv) the lien of real estate taxes and assessments not yet delinquent as of the Closing Date, (v) any exceptions caused by Buyer, its agents, representatives or employees, (vi) such other exceptions as the Title Company shall commit to omit or insure over without any additional cost to Buyer, whether such insurance is made available in consideration of payment, bonding, indemnity of Seller or otherwise, (vii) the Space Leases and Contracts affecting the Property and any Space Lease or other Contract entered into after the Effective Date in accordance with the terms of this Agreement, (viii) subject to the adjustments provided for herein, any service, installation, connection or maintenance charge due after Closing and charges for sewer, water, electricity, telephone, cable television or gas, (ix) rights of vendors and holders of security interests on personal property installed on the Property by Tenants and rights of Tenants to remove fixtures at the expiration of the term of the Space Leases of such tenants, (x) easements and laws, regulations, resolutions or ordinances, including, without limitation, building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Property currently or hereafter imposed by any governmental or quasi-governmental body or authority, (xi) mechanic's liens and notices of commencement as a result of work contracted for by Seller which is ongoing, the cost of which is adjusted for as set forth herein, and (xii) all other matters that arise subsequent to the Effective Date that are approved (or deemed approved) by Buyer under Article VIII hereof.

"Personal Property" shall have the meaning assigned thereto in Section 2.1(b)(ii).

"Person" shall mean a natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity.

"Plans and Specifications" shall have the meaning assigned thereto in Section 2.1(b)(x).

"Property" shall have the meaning assigned thereto in "Background" paragraph A.

"Purchase Price" shall have the meaning assigned thereto in Section 2.2(a).

"Releases" shall have the meaning assigned thereto in Section 7.4(a).

"Rents" shall have the meaning assigned thereto in Section 10.1(a).

"Reporting Person" shall have the meaning assigned thereto in Section 15.3(b).

"Retail Merchandise" shall have the meaning assigned thereto in Section 2.1(b)(vii).

"Seller" shall have the meaning assigned thereto in the Preamble to this Agreement.

"Seller Verification Notice" shall have the meaning assigned thereto in Section 15.19(b).

"Seller's Broker" shall have the meaning assigned thereto in Section 15.2(a).

"Seller's Knowledge" shall mean the actual knowledge of Seller based upon the actual knowledge of David Valade, without any duty on the part of such Person to conduct any independent investigation or make any inquiry of any Person. The named individual shall have no personal liability by virtue of his inclusion in this definition.

"Seller's Leasing Costs" shall have the meaning assigned thereto in Section 10.7.

"Seller-Related Entities" shall have the meaning assigned thereto in Section 11.2.

"Seller-Waived Breach" shall have the meaning assigned thereto in Section 11.3(b).

"Space Leases" shall mean all leases, licenses and other occupancy agreements for all or any portion of the Property (other than in the ordinary course to hotel guests).

"Survey" shall mean the survey of the Property described on Schedule 1.1(b) hereto. If Schedule 1.1(b) reflects that no current Survey of the Property is available, it shall be Buyer's responsibility to promptly order an ALTA survey of the Property at Buyer's sole cost and expense.

"Taxes" shall mean any and all fees (including, without limitation, documentation, recording, license and registration fees), taxes (including, without limitation, net income, alternative, unitary, alternative minimum, minimum franchise, value added, ad valorem, income, receipts, capital, excise, sales, use, leasing, fuel, excess profits, turnover, occupation, property (including personal, real, tangible and intangible property taxes), transfer, recording and stamp, and intangible), levies, impositions, duties, charges, fees (including impact fees), assessments, or withholdings of any nature whatsoever, general or special, ordinary or extraordinary, and any transaction privileges or similar taxes imposed by or on behalf of a Governmental Authority, together with any and all penalties, fines, additions to tax and interest thereon, whether disputed or not.

"Tenant Notices" shall have the meaning assigned thereto in Section 6.1(c).

"Tenants" shall mean the tenants under the Space Leases.

"Terminated Contracts" shall mean all Contracts except the Assumed Contracts.

"Title Commitment" shall mean that certain owner's title commitment, with respect to the Property to be issued by the Title Company.

"Title Company" shall mean First American Title Insurance Company.

"Title Policy" shall have the meaning set forth in Section 8.4.

"Transferred Employees" shall have the meaning set forth in Section 14.1(b).

"Violations" shall mean all violations of Applicable Law now or hereafter issued or noted, including any open building permits and any fines or penalties associated with the foregoing.

"WARN Act" shall mean the Worker's Adjustment and Retraining Notification Act of 1988, and any similar state and local law applicable, as amended from time to time, and any regulations and guidance issued pursuant thereto.

"Warranties" shall have the meaning set forth in Section 2.1(b)(v).

## ARTICLE II

## SALE, CONSIDERATION AND CLOSING

Section 2.1    Sale of Assets.  (a) On the Closing Date and pursuant to the terms and subject to the conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of the Assets.

(b) The transfer of the Assets to Buyer shall include the transfer of all Asset-Related Property.  For purposes of this Agreement, "Asset-Related Property" shall mean the following:

(i)    all of Seller's right, title and interest in and to all easements, rights of way, privileges, covenants, common interests and other rights appurtenant to the Property and all right, title and interest of Seller, if any, in and to any land lying in the bed of any street, road, avenue or alley, open or closed, in front of or adjoining the Property and to the center line thereof;

(ii)    all personal property, operating equipment and furniture, fixtures, equipment, tools, supplies, Vehicles (including shuttle vans, if any) and other personal property used in the operation of the Property and expressly excluding any Excluded Assets (the "Personal Property");

(iii)    all food and beverages (alcoholic, to the extent transferable under Applicable Law, and non-alcoholic); engineering, maintenance, and housekeeping supplies, including soap, cleaning materials and matches; stationery and printing; and other supplies of all kinds, in each case whether partially used, unused, or held in reserve storage for future use in connection with the maintenance and operation of the Property, which are on hand on the date of this Agreement subject to such depletion and restocking

as shall occur and be made in the normal course of business but in accordance with present standards, excluding, however, the Personal Property and any items owned by any Lessee under any Space Lease (collectively, the "Consumables");

(iv)     to the extent they may be transferred without consent under Applicable Law and without cost to Seller, all licenses, permits and authorizations presently issued in connection with the operation of all or any part of the Property as it is presently being operated and entitlements for approved and future development of the Property but excluding the Franchise Agreement (the "Licenses and Permits");

(v)     to the extent assignable without consent and without cost to Seller, all warranties, if any, issued to Seller by any manufacturer or contractor in connection with construction or installation of equipment or any component of the improvements included as part of the Property (the "Warranties");

(vi)     to the extent assignable without cost to Seller, all of Seller's right, title and interest in all other intangibles associated with the Property, including, without limitation, goodwill, all logos, designs, trade names, building names, trademarks related to the property and other general intangibles relating to the Property, and all telephone exchange numbers specifically dedicated and identified with the Property, other than any Excluded Assets (the "General Intangibles");

(vii)     all merchandise located at the Property and held for sale to guests and customers thereof, or ordered for future sale at the Property as of the Cut-Off Time, but not including any such merchandise owned by any Tenant at the Property ("Retail Merchandise");

(viii)     all Space Leases, Assumed Contracts and all security (to the extent assignable) and escrow deposits held by Seller in connection with any such Space Lease;

(ix)     all books and records, including without limitation tenant files, tenant lists and tenant marketing information relating to the Property, each to the extent in Seller's possession or reasonably obtainable by Seller without additional cost (the "Books and Records"); however, Buyer agrees that Seller may keep a duplicate set of all of the Books and Records to be able to administer its bankruptcy proceeding, to be able to use for reference for tax inquiries and for other legitimate purposes;

(x)     to the extent assignable without additional cost to seller, (A) building permits and (B) the plans and specifications, engineering drawings and prints with respect to the improvements, all operating manuals, and all books, data and records regarding the physical components systems of the improvements at the Property, each to the extent assignable and in Seller's possession (the "Plans and Specifications"); and

(xi)     all Bookings from and prior to Closing and any Booking Deposits therefor in accordance with Section 10.11.

(c) Notwithstanding anything to the contrary contained in this Agreement, it is expressly agreed by the parties hereto that the following items are expressly excluded from the Assets to be sold to Buyer (collectively, the "Excluded Assets"):

(i) Cash. The balances of all cash and securities and other cash equivalent interests held by Seller or by the Manager for the benefit of Seller or the Property and deposited, held or contained in any account, bank or vault, including, without limitation, any cash held in reserves or escrows maintained by Seller or by the Manager and any and all deposits or prepayments made by or held for the account of Seller (including any utility deposits, and any deposits or prepayments made by a Manager for the account of Seller).

(ii) Third Party Property. Any fixtures, personal property, equipment, trademarks or other intellectual property or other assets which are owned by (A) the supplier or vendor under any Contract (provided, however, that Seller shall transfer its rights and interest in any such leased property with respect to any such lease that is an Assumed Contract), (B) the Tenants, (C) any Employees, (D) any guests or customers of the Property or (E) the Manager (collectively, the "Excluded Personal Property").

(iii) Insurance Claims. Any insurance claims or proceeds arising out of or relating to events that occur prior to the Closing Date subject to the terms of Section 9.2(a).

(iv) Additional Reserved Seller Assets. Any of Seller's proprietary, privileged or confidential materials (including any materials relating to the background or financial condition of a present or prior direct or indirect partner or member of Seller), the internal books and records of Seller relating, for example, to contributions and distributions prior to the Closing, any software not used exclusively in the day-to-day operation of the building, the names "Hotel Capital", "Wyndham Garden" and any derivations thereof, and any trademarks, service marks, trade names, brand marks, brand names, domain names, social media sites (such as Facebook or Twitter), trade dress or logos relating thereto or to any Franchisor, Manager, Tenant, concessionaire or any third party, any development bonds, letters of credit or other collateral held by or posted with any Governmental Authority or other third party with respect to any improvement, subdivision or development obligations concerning the Property or any other real property, and any other intangible property that is not used exclusively in connection with the Property.

(v) Franchise Agreement and National Service Contracts. The Franchise Agreement and any software licensed thereto or therewith and any National Service Contracts, unless the franchisor has consented to the transfer of the Franchise Agreement to the Buyer with the Buyer assuming all obligations owing to the franchisor.

Section 2.2    Purchase Price.

(a) The aggregate consideration to be paid by Buyer to Seller for the Assets (subject to adjustment as specifically provided herein) shall be **$2,900,000.00** (the "Purchase Price"). The Purchase Price shall be paid to Seller as follows:

(i) On or before the fifth (5th) Business Day after submission of this Agreement signed by Buyer to the Seller to Escrow Agent, Buyer shall deposit with the Escrow Agent an amount of $200,000.00 (the "Earnest Money"). Buyer has the right to terminate this Agreement and receive a return of the Earnest Money in full and any interest earned thereon at any time prior to the later of (i) approval of the sale of the Assets to Buyer by the bankruptcy court or midnight April 22, 2020. Except as expressly provided elsewhere in this Agreement, the Earnest Money shall be non-refundable to Buyer. Escrow Agent shall hold such Earnest Money in the Escrow Account and disburse the Earnest Money pursuant to the terms of this Agreement upon Closing or earlier termination of this Agreement.

(ii) At the Closing, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to (X) the Purchase Price minus (Y) the Earnest Money and subject to the credits, proration's and adjustments provided herein and as expressly set forth in this Agreement.

(b) Upon delivery to Escrow Agent by Buyer, the Earnest Money will be deposited by Escrow Agent in the Escrow Account, which shall be an interest-bearing account acceptable to Buyer and Seller and shall be held in escrow in accordance with the provisions of this Section 2.2 and Section 15.4.

(c) No adjustment shall be made to the Purchase Price except as explicitly set forth in this Agreement or as may be bid by the Buyer at the hearing to approve the sale transaction as conducted by the bankruptcy court.

Section 2.3    The Closing.

(a) The closing of the sale and purchase of the Assets (the "Closing") shall take place on the date which is fifty five (55) days after full execution of this Agreement or within 20 days of the approval of the sale by the bankruptcy court, whichever date is later (the "Closing Date"), TIME BEING OF THE ESSENCE with respect to the Buyer's obligations hereunder on the Closing Date. Notwithstanding the foregoing, the Closing Date may occur on an earlier date upon mutual agreement of the Parties.

(b) The Closing shall be held on the Closing Date at 3:00 P.M. (ET). There shall be no requirement that Seller and Buyer physically attend the Closing, and all funds and documents to be delivered at the Closing shall be delivered to the Escrow Agent on or prior to the Closing Date unless the parties hereto mutually agree otherwise. Buyer and Seller hereby authorize their respective attorneys to execute and deliver to the Escrow Agent any additional or supplementary instructions as may be necessary or convenient to implement the terms of this Agreement and facilitate the closing of the transactions contemplated hereby, provided, however, that such instructions are consistent with and merely supplement this Agreement and shall not in any way modify, amend or supersede this Agreement.

Section 2.4    Allocated Purchase Price.  Seller and Buyer hereby agree that the Purchase Price shall be allocated for federal, state and local tax purposes, as applicable (in accordance with the rules of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and any similar provision of state, local or foreign law) among the real property and other tangible and intangible property comprising the Property and Asset-Related Property (the "Allocated Purchase Price") pursuant to written agreement of the Buyer and Seller on or before ten days before the Closing Date.  Buyer and Seller shall (a) cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocated Purchase Price, including any amendments to such forms required pursuant to this Agreement with respect to any adjustments to the Purchase Price and (b) file all federal, state and local tax returns and related tax documents consistent with such allocations, as the same may be adjusted pursuant to the terms of Article X or any other provisions of this Agreement, and not take any position (whether in audits, tax returns or otherwise) inconsistent with such allocations unless otherwise required by Applicable Law.  The Allocated Purchase Price shall include an allocation to tangible personal property subject to sales tax, provided that such allocation shall not limit Seller's obligation to pay such taxes pursuant to Section 9.1 hereof.  Buyer shall provide Seller with a sales tax exemption certificate for goods sold to it by Seller and purchased by Buyer for resale or otherwise not subject to sales tax. Notwithstanding anything in this Agreement to the contrary, in the event Seller and Buyer are not able to agree upon the Allocated Purchase Price (or any amendment thereto) after negotiating in good faith, Buyer and the Seller shall use its own Allocated Purchase Price (and any amendment thereto) for purposes of this Section 2.4 to the extent permitted by Applicable Law.

# ARTICLE III

## REPRESENTATIONS, WARRANTIES AND CERTAIN COVENANTS OF SELLER

Section 3.1    General Seller Representations and Warranties.  Subject to the information disclosed in the Asset File, Seller hereby represents and warrants to Buyer, as of the Effective Date as follows:

(a)    Formation; Existence.  Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)    Power and Authority.  Seller has all requisite power and authority to enter into this Agreement and the Closing Documents to which it is a party, subject only to approval of the sale by the bankruptcy court, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Closing Documents to which Seller is a party and the consummation of the transactions provided for in this Agreement and the Closing Documents to which Seller is a party have been duly authorized by all necessary action on its part, subject to the approval by the bankruptcy court.  This Agreement has been duly executed and delivered by Seller and constitutes, and the Closing Documents to be executed and delivered by it, when executed and delivered at the Closing, and assuming due authorization, execution and delivery by Buyer, will constitute, its legal, valid and binding obligation, enforceable against it in accordance with their terms (except as such enforceability may be limited by bankruptcy,

insolvency, reorganization, moratorium or other laws affecting creditors' rights and by general principles of equity (whether applied in a proceeding at law or in equity)).

(c)     No Consents.  No consent or approval of any Governmental Authority is required to be obtained or made in connection with Seller's execution, delivery and performance of this Agreement, the Closing Documents to which Seller is a party or any of the transactions required or contemplated hereby or thereby other than (i) any consent necessary for the landlord that owns the Property and Buyer expressly understands it must obtain such consent of the landlord to assume the underlying lease of the Property, (ii) any consents that have already been obtained or made or that will be obtained prior to or at Closing, (iii) any consent, license, approval, order, permit, authorization, registration, filing or declaration, the failure of which to obtain will not materially adversely affect Seller's ability to consummate the transactions contemplated by this Agreement or the ownership of the Asset and (iv) any consent described on Schedule 2.1(c).

(d)     No Conflicts.  The execution, delivery and compliance with, and performance of the terms and provisions of, this Agreement and the Closing Documents to which it is a party does not and will not (with or without notice or lapse of time or both) (i) conflict with or result in any violation of its organizational documents, (ii) conflict with or result in any violation of any provision of any bond, note or other instrument of indebtedness, contract, indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party except as set forth on Schedule 3.1(d) or (iii) violate any Applicable Law relating to it or its Property except, in each case, for any conflict or violation which will not materially adversely affect Seller's ability to consummate the transactions contemplated by this Agreement.

(e)     Foreign Person.  Seller is a disregarded entity for U.S. federal income tax purposes and the owner of Seller for U.S. federal tax purposes is not a "foreign person" as defined in Section 1445 of the Code and the regulations issued thereunder.

(f)     Anti-Terrorism Laws.  Seller is currently in compliance with and shall at all times during the term of this Agreement remain in compliance with the regulations of the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other action by a Governmental Authority relating thereto.

(g)     Bankruptcy.  Seller is under Chapter 11 Bankruptcy Protection and therefore any sale of the Assets must be approved by the bankruptcy court.

Section 3.2     Representations and Warranties of Seller as to the Assets.  Subject to the information disclosed in the Asset File and matters of public record relating to or in connection with the Property, Seller hereby represents and warrants to Buyer, as of the Effective Date, as follows:

(a)  Material Contracts.  To Seller's Knowledge, Schedule 3.2(a) lists the Material Contracts affecting the Property as of the Effective Date.  To Seller's Knowledge, Seller has delivered or made available to Buyer true and complete copies of such Material Contracts, and, except as set forth on Schedule 3.2(a), Seller has not given or received any written notice of any breach or default under any such Material Contract that has not been cured or otherwise satisfied.

(b)  Space Leases.  Schedule 3.2(b) lists all Space Leases at the Property as of the Effective Date.  As of the Effective Date, such Space Leases have not been amended, supplemented or otherwise modified except as stated in Schedule 3.2(b).  To Seller's Knowledge, Seller has delivered or made available to Buyer true and complete copies of the Space Leases.  Except as set forth on Schedule 3.2(b), as of the Effective Date, Seller has not given or received any written notice of any breach or default under any Space Lease that has not been cured or otherwise satisfied.

(c)  Condemnation.  There are no condemnation or eminent domain proceedings pending or, to Seller's Knowledge, threatened in writing against the Property.

(d)  Litigation.  Except as set forth in Schedule 3.2(d), there are no actions, suits, arbitrations, orders, decrees, claims, writs, injunctions, proceedings pending or, to Seller's Knowledge, threatened in writing against Seller or affecting Seller which, if determined adversely to such entity, would materially and adversely affect the ability of Seller to perform its obligations hereunder.  Seller is not a party to or subject to the provision of any judgment, order, writ, injunction, decree or award of any Governmental Authority which would materially and adversely affect the ability of Seller to perform its obligations hereunder.

(e)  Ownership of the Personal Property.  To Seller's Knowledge, Seller has good title to the Personal Property (other than the Excluded Personal Property) and the same is (or will be at Closing) free and clear of all Liens, charges and encumbrances, other than the rights of any vendors or suppliers under Contracts and any Permitted Exceptions.

(f)  As of the Effective Date, to Seller's Knowledge, there have been no material changes to the Assets or the operations of Seller's business utilizing the Assets in the period between August 20, 2018 and the Effective Date.

(g)  Environmental Matters.  As of the Effective Date, to Seller's Knowledge, Seller has not received any written notice from any Governmental Authority of any material Environmental Claims, Environmental Liabilities or violations of any Environmental Laws with respect to the Property which has not been cured.

(h)  Financial Statements.  The profit and loss statements and balance sheets for the Property provided by Seller to Buyer in the Asset Files are the profit and loss statements and balance sheets provided to Seller by the Manager and used by Seller to prepare its federal tax returns.

(i)  Violations.  To Seller's Knowledge, Seller has not received any written notice from any Governmental Authority of any material Violations with respect to the Property which has not been cured.

(j)     Employees.  Seller does not have any Employees.  All Employees who provide management services at the Property are employees of the Manager and not Seller. Buyer understands that it must make arrangements with any Employees to procure their ongoing work post-Closing.

Section 3.3     Amendments to Schedules; Limitations on Representations and Warranties of Seller.

(a)     Seller shall have the right and obligation to amend and supplement the schedules to this Agreement from time to time prior to the Closing by providing a written copy of such amendment or supplement to Buyer; provided, however, that any amendment or supplement to the schedules to this Agreement which does not reflect a material adverse change to the Assets or the value thereof shall have no effect for the purposes of determining whether Section 5.2(a) has been satisfied, but shall have effect only for the purposes of limiting the defense and indemnification obligations of Seller for the inaccuracy or untruth of the representation or warranty qualified by such amendment or supplement.  Notwithstanding the foregoing, if Buyer elects to close with the knowledge of, and notwithstanding any such failure of a condition to its obligation to close, then Buyer shall not be entitled to bring any claims against Seller following the Closing due to a breach of a representation or warranty based on any amendment or supplement described in this Section 3.3(a).

(b)     Notwithstanding anything in this Agreement to the contrary, if the representations and warranties relating to the Space Leases or Material Contracts set forth in Section 3.2 and the status of the Tenants and contract parties thereunder (other than Seller or its Affiliates) were true and correct as of the Effective Date in all material respects, no change in circumstances or status of such Tenants or contract parties (e.g., defaults, bankruptcies or other adverse matters relating to such Tenants or contract parties) occurring after the Effective Date shall permit Buyer to terminate this Agreement or constitute grounds for Buyer's failure to close.

Section 3.4     Covenants of Seller Prior to Closing.

(a)     Asset File.  Seller shall deliver or make available to Buyer, or cause Seller's representatives to deliver or make available to Buyer, the Asset File promptly after the Effective Date, to the extent not previously delivered or made available to Buyer.

(b)     Insurance.  From the Effective Date until Closing, Seller shall keep the Property insured against fire and other hazards covered by the insurance policies maintained (or policies that are similar in all material respects) by Seller on the Effective Date.

(c)     Operation.  From the Effective Date until Closing, Seller shall operate and maintain the Property in the ordinary course of business and generally consistent with Seller's past practices with respect to the Property, except that Seller shall not be required to make any capital improvement or replacements to the Property or cure or remove any Violations.

(d)     New Contracts.  From and after the Effective Date until Closing, Seller shall not enter into any new third party Contracts relating to the Assets, nor amend, supplement, terminate or otherwise modify any Material Contract (other than renewal of any Contract that

renews automatically in accordance with its terms) without the prior written consent of Buyer, which consent may be granted or withheld in Buyer's reasonable discretion, provided, however:

(i)     Buyer's consent shall not be required with respect to any Contract that (A) is entered into by Seller in the ordinary course of business at, or for the benefit of, the Property, (B) is terminable on thirty (30) days' notice without cost or penalty to Buyer and (C) requires the payment of no more than $50,000 in any calendar year;

(ii)     Buyer's consent shall not be required with respect to any Contract which does not meet the requirements of clauses (A) through (C) of clause (i) above but is entered into by Seller in connection with emergency maintenance or repairs at a Property; provided that Seller shall pay all of the costs of such emergency maintenance or repairs; and

(iii)     Buyer shall not unreasonably withhold its consent to any Contract which does not meet the requirements of clause (A) through (C) of clause (i) above but which is entered into by Seller in connection with a Leasing Cost.

If Seller enters into any third-party Contract as permitted in clause (i) through (iii) above, then such Contract shall be included in the definition of "Assumed Contract", and shall be assigned to and assumed by Buyer at the Closing in accordance with this Agreement.  If Buyer does not reject or approve a new Contract, or an amendment or modification to a Contract, in each case within five (5) Business Days after receipt of a copy thereof, then Buyer shall be deemed to have approved such Contract or amendment or modification.  Nothing in this Section 3.4(d) shall be deemed to restrict Seller's ability to enter into Bookings in the ordinary course of business.

(e)     New Space Leases.  From and after the Effective Date until Closing, Seller shall not (i) execute any new Space Lease, (ii) amend, supplement, terminate, accept the surrender of, renew or otherwise modify any existing Space Lease or (iii) approve any assignment or sublease of any existing Space Lease without the prior consent of Buyer, which consent may be granted or withheld in Buyer's sole discretion.  If Seller enters into any new Space Lease, or renews any existing Space Lease (each such new Space Lease or renewal, a "New Lease") with the approval of Buyer, then each such New Lease shall be included in the definition of "Space Leases" herein and added to Schedule 3.2(b), and shall be assigned to and assumed by Buyer at the Closing in accordance with this Agreement.  If Buyer does not reject or approve a New Lease, license, occupancy agreement, renewal or a Space Lease amendment within five (5) Business Days after receipt of a copy thereof, then Buyer shall be deemed to have approved such New Lease, license, occupancy agreement, renewal or Space Lease amendment.

(f)     Litigation.  From the Effective Date until Closing, Seller shall advise Buyer promptly of any litigation, arbitration proceeding or administrative hearing (including condemnation) before any Governmental Authority which (i) is instituted after the date of this Agreement and (ii) if adversely determined, would materially adversely affect the Seller's ability to consummate the transactions contemplated by this Agreement.

(g)     Terminated Contracts.  On or prior to the Closing Date, Seller shall

terminate the Terminated Contracts. All termination fees and any other costs and expenses relating to such termination shall be the responsibility solely of Seller, and Buyer shall have no responsibility or liability therefor. Seller shall not assign to Buyer, and Buyer shall not assume, any Terminated Contracts or any rights or obligations thereunder.

(h)      <u>Taxes, Charges, etc</u>. From the Effective Date until Closing, Seller shall continue to pay or cause to be paid all Taxes, water and sewer charges and perform all material obligations under the Material Contracts in the ordinary course of business.

(i)      <u>Transfer</u>. From the Effective Date until Closing, Seller shall not transfer, sell or otherwise dispose of the Property or any item of Personal Property without the prior written consent of Buyer, except for the use and consumption of inventory and other supplies, and the replacement of worn out, obsolete and defective tools, equipment and appliances, in the ordinary course of business.

(j)      <u>Excluded Assets</u>. Nothing in this Section 3.4 shall restrict Seller's rights with respect to any of the Excluded Assets or give Buyer any approval or other rights with respect thereto.

## ARTICLE IV

## REPRESENTATIONS, WARRANTIES AND CERTAIN COVENANTS OF BUYER

Section 4.1      <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller, as of the Effective Date, as follows:

(a)      <u>Formation; Existence</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Arizona, and qualified to do business in the State of Arizona.

(b)      <u>Power and Authority</u>. Buyer has all requisite power and authority to enter into this Agreement and the Closing Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Closing Documents to which it is a party and the consummation of the transactions provided for in this Agreement and the Closing Documents to which Buyer is a party have been duly authorized by all necessary action on its part. This Agreement has been duly executed and delivered by it and constitutes, and the Closing Documents to be executed and delivered by Buyer, when executed and delivered at the Closing and assuming due authorization, execution and delivery by Seller, will constitute, its legal, valid and binding obligation, enforceable against it in accordance with their terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights and by general principles of equity (whether applied in a proceeding at law or in equity)).

(c)      <u>No Consents</u>. No consent, license, approval, order, permit or authorization of, or registration, filing or declaration with, any court, administrative agency or commission or other Governmental Authority is required to be obtained or made by Buyer in

connection with the execution, delivery and performance of this Agreement, the Closing Documents to which it is a party or any of the transactions required hereby.

(d) <u>No Conflicts</u>. The execution, delivery and compliance with, and performance of the terms and provisions of, this Agreement and the Closing Documents to which it is a party does not and will not (with or without notice or lapse of time or both) (i) conflict with or result in any violation of its organizational documents, (ii) conflict with or result in any violation of any provision of any bond, note or other instrument of indebtedness, contract, indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which the Buyer is a party in its individual capacity, or (iii) violate any Applicable Law relating to Buyer or its subsidiaries or its assets or properties.

(e) <u>Bankruptcy</u>. Buyer is not a debtor under any bankruptcy proceedings, voluntary or involuntary, and has not made an assignment for the benefit of its creditors.

(f) <u>Litigation</u>. There are no actions, suits, arbitrations, orders, decrees, claims, writs, injunctions, government investigations, proceedings pending or, to Buyer's Knowledge, threatened in writing against Buyer or affecting Buyer which, if determined adversely to such entity, would adversely affect the ability of Buyer to perform its obligations hereunder. Buyer is not a party to or subject to the provision of any judgment, order, writ, injunction, decree or award of any Governmental Authority which would adversely affect the ability of Buyer to perform its obligations hereunder.

(g) <u>Anti-Terrorism Laws</u>. Buyer is currently in compliance with and shall at all times during the term of this Agreement remain in compliance with the regulations of OFAC of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other action by a Governmental Authority relating thereto.

<u>Section 4.2</u>    <u>Covenants of Buyer.</u>

(a) <u>Bookings</u>. Buyer shall honor all existing Bookings and all other Bookings made in accordance with this Agreement for any period beginning on or before the Closing Date.

(b) <u>Assumed Contracts</u>. Buyer shall assume as of the Closing the Assumed Contracts.

(c) <u>Franchise Agreement</u>. The Property is operated under and pursuant to the Franchise Agreement. Buyer covenants to take such actions and make such applications as may be necessary to, as of the Closing Date, enter into a new franchise agreement with the Franchisor upon terms and conditions which allow Seller to obtain a release of Seller's and any guarantor's obligations, responsibilities and requirements under the existing Franchise Agreement and the Franchise Guaranty from and after the Closing. Seller shall reasonably cooperate with Buyer's efforts to enter into a new franchise agreement. Buyer shall be responsible for, and shall pay on or before the Closing, any fees, costs or expenses, related to, caused by or associated with obtaining a new franchise agreement. Seller shall not be obligated to pay any amounts in

connection with the Buyer's new franchise agreement except Seller's own attorneys' fees and expenses with respect to the termination of the Franchise Agreement (in connection with Buyer or its designee entering into a new franchise agreement with Franchisor) and the release from all obligations and liabilities of Seller and any guarantor under the Franchise Agreement and the Franchise Guaranty from and after Closing. Buyer acknowledges that Buyer's ability to enter into an agreement to operate the Property under the existing flag or a new flag is not a condition to the Closing. In the event that Buyer has not terminated this Agreement in accordance with the terms hereof and has not entered into a new franchise agreement with Franchisor as contemplated by this Agreement, Buyer shall be responsible for and pay any liquidated damages, termination fees or the like that may be assessed to Seller.

**ARTICLE V**

**<u>CONDITIONS PRECEDENT TO CLOSING</u>**

Section 5.1    <u>Conditions Precedent to Seller's Obligations</u>.  The obligation of Seller to consummate the transfer of the Assets to Buyer on the Closing Date is subject to the satisfaction (or waiver by Seller) as of the Closing Date of the following conditions:

(a)    Each of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date (unless such representation or warranty is made on and as of a specific date, in which case it shall be true and correct in all material respects as of such date);

(b)    Buyer shall have performed or complied in all material respects with each obligation and covenant required by this Agreement to be performed or complied with by Buyer on or before the Closing;

(c)    Escrow Agent shall have received all of the documents required to be delivered by Buyer under <u>Article VI</u>;

(d)    Escrow Agent shall have received the Purchase Price in accordance with Section 2.2 and all other amounts due to Seller hereunder;

(e)    Seller shall seek approval of the sale in its bankruptcy proceeding, such procedure being subject to any higher and better offers.  No order or injunction of any court or administrative agency of competent jurisdiction nor any statute, rule, regulation or executive order promulgated by any Governmental Authority of competent jurisdiction shall be in effect as of the Closing which restrains or prohibits the transfer of the Assets or the consummation of any other transaction contemplated hereby;

(f)    No action, suit or other proceeding shall be pending which shall have been brought by a Person that is not Seller or an Affiliate of Seller to restrain, prohibit or change in any material respect the transactions contemplated under this Agreement;

(g)     Except for any amounts owed by Seller and accrued during the period prior to Closing, Seller shall be released from all obligations and liabilities under any contracts or other undertakings to be assumed by Buyer pursuant to this Agreement; and

(h)     Except for any franchise or other fees and amounts owed by Seller and accrued during the period prior to Closing in amounts agreed to by Seller and the Franchisor, Seller and the guarantor under any Franchise Guaranty shall be released by the franchisor from all obligations and liabilities under the Franchise Agreement from and after the Closing.

Section 5.2     Conditions Precedent to Buyer's Obligations.  The obligation of Buyer to purchase and pay for the Assets is subject to the satisfaction (or waiver by Buyer) as of the Closing of the following conditions:

(a)     Each of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date (unless such representation or warranty is made on, as of and expressly limited to a specific date, in which case it shall be true and correct in all material respects as of such specific date) (subject to any changes in the schedules to this Agreement permitted pursuant to Section 3.3(a) hereof), except where such material breach of such representation and warranty of Seller under this Agreement will not materially adversely affect the Assets or the value thereof;

(b)     Seller shall have performed or complied in all material respects with each obligation and covenant required by this Agreement to be performed or complied with by Seller on or before the Closing except where such material breach of such obligation or covenant of Seller under this Agreement will not materially adversely affect the Seller's ability to consummate the transactions contemplated by this Agreement;

(c)     No order or injunction of any court or administrative agency of competent jurisdiction nor any statute, rule, regulation or executive order promulgated by any Governmental Authority of competent jurisdiction shall be in effect as of the Closing which restrains or prohibits the transfer of the Assets or the consummation of any other transaction contemplated hereby;

(d)     Title to the Property shall be delivered to Buyer in the manner required under Section 8.1; and

(e)     Buyer shall have received all of the documents required to be delivered by Seller under Article VI.

Section 5.3     Waiver of Conditions Precedent.  The Closing shall constitute conclusive evidence that Seller and Buyer have respectively waived any conditions which are not satisfied as of the Closing.

# ARTICLE VI

# CLOSING DELIVERIES

Section 6.1    Buyer Deliveries.  Buyer shall deliver the following documents to Escrow Agent at the Closing:

(a)    an assignment and assumption of Seller's interest in the Space Leases (the "Assignment of Leases"), duly executed by Buyer in substantially the form of Exhibit A hereto;

(b)    an assignment and assumption of the Assumed Contracts, Bookings, Licenses and Permits, Warranties and General Intangibles (the "Assignment of Contracts, Bookings, Licenses, Permits, Warranties and General Intangibles") duly executed by Buyer in substantially the form of Exhibit B hereto;

(c)    a notice letter to the Tenants (collectively, the "Vendor Notices") duly executed by Buyer, in substantially the form of Exhibit C attached hereto;

(d)    an assignment and assumption of the land lease (the "Assignment and Assumption of Land Lease") duly executed by Buyer, in substantially the form of Exhibit D attached hereto;

(e)    such other assignments, instruments of transfer, and other documents as Seller may reasonably require in order to complete the transactions contemplated hereunder, in each case, duly executed by Buyer;

(f)    a duly executed officer's certificate from Buyer (or the general partner or manager member of the Buyer, where appropriate) certifying that Buyer has taken all necessary action to authorize the execution of all documents being delivered hereunder and the consummation of all of the transactions contemplated hereby and that such authorization has not been revoked, modified or amended;

(g)    an executed incumbency certificate from Buyer (or the general partner or manager member of the Buyer, where appropriate) certifying the authority of the officers of Buyer (or the general partner or manager member of the Buyer, where appropriate) to execute this Agreement and the other documents delivered by Buyer to Seller at the Closing;

(h)    all transfer tax returns, to the extent required by Applicable Law, in connection with the payment of all state or local real property transfer taxes that are payable or arise as a result of the consummation of the transactions contemplated by this Agreement, in each case, as prepared by Seller and duly executed by Buyer;

(i)    the Closing Statement, prepared by the Escrow Agent and duly executed by Buyer; and

Section 6.2    Seller Deliveries.

Seller shall deliver the following documents to Escrow Agent at the Closing:

(a)     an Assignment and Assumption of Land Lease in substantially the form attached hereto as <u>Exhibit E</u>, duly executed by Seller;

(b)     a special warranty deed (a "<u>Deed</u>") prepared by the Escrow Agent, subject to the land lease and other permitted exceptions, duly executed by Seller;

(c)     an Assignment of Leases, prepared by the Buyer, and duly executed by Seller;

(d)     an Assignment of Contracts, Bookings, Licenses, Permits, Warranties and General Intangibles, prepared by the Buyer, and duly executed by Seller;

(e)     a bill of sale with respect to the Personal Property located at the Property (a "<u>Bill of Sale</u>"), prepared by the Buyer, and duly executed by Seller in substantially the form of <u>Exhibit E</u> hereto;

(f)     a termination of the Management Agreement, duly executed by Seller;

(g)     the Tenant Notices, prepared by the Buyer, and duly executed by Seller;

(h)     all transfer tax returns which are required by law and the regulations issued pursuant thereto in connection with the payment of all state or local real property transfer taxes that are payable or arise as a result of the consummation of the transactions contemplated by this Agreement, in each case, as prepared by the Buyer;

(i)     the Closing Statement, prepared by the Escrow Agent and duly executed by Seller.

Section 6.3     Cooperation.

In the event any Asset-Related Property is not assignable (such as a letter of credit that is not transferable), Seller shall use commercially reasonable efforts to provide Buyer, at no cost to Seller, with the economic benefits of such property by enforcing such property (at Buyer's direction) for the benefit and at the expense of Buyer.

**ARTICLE VII**

**<u>INSPECTION</u>**

Section 7.1     General Right of Inspection. Through the earlier of Closing or the termination of this Agreement in accordance with the terms hereof, Buyer and its agents shall have the right, upon reasonable prior written notice to Seller (which shall in any event be at least 24 hours in advance) and at Buyer's sole cost, risk and expense, to inspect the Property during normal business hours on Business Days, provided, however, that any such inspection shall not unreasonably impede the normal day-to-day business operation of the Property and, provided, further, that a representative of Seller shall be entitled to accompany Buyer and its agents on

such inspection. Notwithstanding the foregoing, Buyer shall not communicate with or contact any of the Employees, any of the Tenants, any hotel guests or licensees, other users or occupants of the Property or any of the Governmental Authorities without the prior written consent of Seller (which may be granted or denied in Seller's reasonable discretion provided, that Buyer shall be permitted to interview the general manager, director of sales and controller of the hotel with prior notice to and in the presence of a representative of Seller) or conduct any invasive testing of the Property without the prior written consent of Seller (which may be granted or denied in Seller's sole and absolute discretion). A representative of Seller shall be entitled to accompany Buyer and its agents on and be present during any and all such permitted interviews and testing, provided, however, that Buyer may consult with its advisors, potential operators and sales people without Seller being present. Buyer's right of inspection of the Property shall be subject to the rights of Tenants, hotel guests and licensees and the rights of the Manager under the Management Agreement. Prior to any such inspection, Buyer shall deliver to Seller certificates reasonably satisfactory to Seller evidencing that Buyer and Buyer's consultants and agents carry and maintain such general liability insurance policies with such companies and in such scope and amounts as are acceptable to Seller in its reasonable discretion, in all cases naming Seller as an additional insured and loss payee thereunder. Buyer hereby indemnifies and agrees to defend and hold Seller and Seller-Related Entities (as defined below) harmless from and against all Losses arising out of, resulting from relating to or in connection with or from any such inspection by Buyer or its agents, except to the extent such claim or damage was caused solely by Seller or Seller's agents. At Seller's request, Buyer will promptly furnish to Seller copies of any environmental or engineering reports received by Buyer relating to any inspections of the Property. As part of its inspection, Buyer shall have the right to inspect the following records, upon reasonable request therefore and to the extent they are in the possession of Seller: (i) accounts payable with current aging and a description of the payable, (ii) accounts receivable with current aging and description of each receivable and a breakdown of what the Seller classifies collectable, what is deemed "bad debt" and what has been "written off", all without any representation or warranty by Seller; (iii) deposits that have been paid for future product or services; and (iv) all contracts that encumber title to the property, such as maintenance agreements and equipment leases.

The provisions of this Section 7.1 shall survive the Closing and/or any termination of this Agreement.

Section 7.2 **DISCLAIMER. ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE ASSETS IS SOLELY FOR BUYER'S CONVENIENCE AND WAS OR WILL BE OBTAINED FROM A VARIETY OF SOURCES. SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO (AND EXPRESSLY DISCLAIMS ALL) REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION EXCEPT AS SET FORTH IN THIS AGREEMENT OR THE CLOSING DOCUMENTS. SELLER SHALL NOT BE LIABLE FOR ANY MISTAKES, OMISSIONS, MISREPRESENTATION OR ANY FAILURE TO INVESTIGATE THE ASSETS NOR SHALL SELLER BE BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, APPRAISALS, ENVIRONMENTAL ASSESSMENT REPORTS OR OTHER INFORMATION PERTAINING TO THE ASSETS OR THE OPERATION THEREOF,**

FURNISHED BY SELLER, ITS REPRESENTATIVES OR ANY OTHER PERSON OR ENTITY ACTING ON SELLER'S BEHALF EXCEPT, IN EACH CASE, AS SET FORTH IN THIS AGREEMENT OR IN ANY OF THE CLOSING DOCUMENTS. THE ASSETS ARE BEING SOLD "AS IS" AND "WHERE IS" SUCH THAT BUYER MUST DO ITS OWN DUE DILIGENCE WITH RESPECT TO THE ASSETS.

SECTION 7.3          EXAMINATION; NO CONTINGENCIES.

(a)     IN ENTERING INTO THIS AGREEMENT, BUYER HAS NOT BEEN INDUCED BY AND HAS NOT RELIED UPON ANY WRITTEN OR ORAL REPRESENTATIONS, WARRANTIES OR STATEMENTS, WHETHER EXPRESS OR IMPLIED, MADE BY SELLER, OR ANY PARTNER OF SELLER, OR ANY AFFILIATE, AGENT, EMPLOYEE, OR OTHER REPRESENTATIVE OF ANY OF THE FOREGOING OR BY ANY BROKER OR ANY OTHER PERSON REPRESENTING OR PURPORTING TO REPRESENT SELLER WITH RESPECT TO THE ASSETS, THE CONDITION OF THE ASSETS OR ANY OTHER MATTER AFFECTING OR RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY, OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE CLOSING DOCUMENTS. BUYER'S OBLIGATIONS UNDER THIS AGREEMENT SHALL NOT BE SUBJECT TO ANY CONTINGENCIES, DILIGENCE OR CONDITIONS EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT. BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE DOCUMENTS EXECUTED AND DELIVERED BY SELLER AT CLOSING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, WITH RESPECT TO THE ASSETS OR THE CONDITION OF THE ASSETS. BUYER AGREES THAT THE ASSETS WILL BE SOLD AND CONVEYED TO (AND ACCEPTED BY) BUYER AT THE CLOSING IN THE THEN EXISTING CONDITION OF THE ASSETS, AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WRITTEN OR VERBAL REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE DOCUMENTS EXECUTED AND DELIVERED BY SELLER AT CLOSING. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS SET FORTH IN THIS AGREEMENT OR IN THE DOCUMENTS EXECUTED AND DELIVERED BY SELLER AT CLOSING, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT ARE WITHOUT STATUTORY, EXPRESS OR IMPLIED WARRANTY, REPRESENTATION, AGREEMENT, STATEMENT OR EXPRESSION OF OPINION OF OR WITH RESPECT TO THE CONDITION OF THE ASSETS OR ANY ASPECT THEREOF, INCLUDING, WITHOUT LIMITATION, (I) ANY AND ALL STATUTORY, EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES RELATED TO THE SUITABILITY FOR HABITATION, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, (II) ANY STATUTORY, EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE, BY ANY DESCRIPTION OF THE ASSETS OR BY OPERATION

OF LAW, AND (III) ALL OTHER STATUTORY, EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES BY SELLER WHATSOEVER. BUYER ACKNOWLEDGES THAT BUYER HAS KNOWLEDGE AND EXPERTISE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE BUYER TO EVALUATE THE MERITS AND RISKS OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

(b)     FOR PURPOSES OF THIS AGREEMENT, THE TERM "**CONDITION OF THE ASSETS**" MEANS THE FOLLOWING MATTERS:

(i)     **PHYSICAL CONDITION OF THE PROPERTY**. THE QUALITY, NATURE AND ADEQUACY OF THE PHYSICAL CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE QUALITY OF THE DESIGN, LABOR AND MATERIALS USED TO CONSTRUCT THE IMPROVEMENTS INCLUDED IN THE PROPERTY; THE CONDITION OF STRUCTURAL ELEMENTS, FOUNDATIONS, ROOFS, GLASS, MECHANICAL, PLUMBING, ELECTRICAL, HVAC, SEWAGE, AND UTILITY COMPONENTS AND SYSTEMS; THE CAPACITY OR AVAILABILITY OF SEWER, WATER, OR OTHER UTILITIES; THE GEOLOGY, FLORA, FAUNA, SOILS, SUBSURFACE CONDITIONS, GROUNDWATER, LANDSCAPING, AND IRRIGATION OF OR WITH RESPECT TO THE PROPERTY, THE LOCATION OF THE PROPERTY IN OR NEAR ANY SPECIAL TAXING DISTRICT, FLOOD HAZARD ZONE, WETLANDS AREA, PROTECTED HABITAT, GEOLOGICAL FAULT OR SUBSIDENCE ZONE, HAZARDOUS WASTE DISPOSAL OR CLEAN-UP SITE, OR OTHER SPECIAL AREA, THE EXISTENCE, LOCATION, OR CONDITION OF INGRESS, EGRESS, ACCESS, AND PARKING; THE CONDITION OF THE PERSONAL PROPERTY AND ANY FIXTURES; AND THE PRESENCE OF ANY ASBESTOS OR OTHER HAZARDOUS MATERIALS, DANGEROUS, OR TOXIC SUBSTANCE, MATERIAL OR WASTE IN, ON, UNDER OR ABOUT THE PROPERTY AND THE IMPROVEMENTS LOCATED THEREON. "**HAZARDOUS MATERIALS**" MEANS (A) THOSE SUBSTANCES INCLUDED WITHIN THE DEFINITIONS OF ANY ONE OR MORE OF THE TERMS "HAZARDOUS SUBSTANCES," "TOXIC POLLUTANTS", "HAZARDOUS MATERIALS", "TOXIC SUBSTANCES", AND "HAZARDOUS WASTE" IN THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, 42 U.S.C. § 9601 ET SEQ. (AS AMENDED), THE HAZARDOUS MATERIALS TRANSPORTATION ACT, AS AMENDED, 49 U.S.C. SECTIONS 1801 ET SEQ., THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976 AS AMENDED, 42 U.S.C. SECTION 6901 ET SEQ., SECTION 311 OF THE CLEAN WATER ACT, 15 U.S.C. § 2601 ET SEQ., 33 U.S.C. § 1251 ET SEQ., 42 U.S.C. 7401 ET SEQ., AND THE REGULATIONS AND PUBLICATIONS ISSUED UNDER ANY SUCH LAWS, (B) PETROLEUM, RADON GAS, LEAD BASED PAINT, ASBESTOS OR ASBESTOS CONTAINING MATERIAL AND POLYCHLORINATED BIPHENYLS AND (C) MOLD OR WATER CONDITIONS WHICH MAY EXIST AT THE PROPERTY OR OTHER

**SUBSTANCES, WASTES OR MATERIALS LISTED OR DEFINED BY ANY STATE OR LOCAL STATUTES, REGULATIONS AND ORDINANCES PERTAINING TO THE PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT.**

(ii) **ADEQUACY OF THE ASSETS. THE ECONOMIC FEASIBILITY, CASH FLOW AND EXPENSES OF THE ASSETS, AND HABITABILITY, MERCHANTABILITY, FITNESS, SUITABILITY AND ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR USE OR PURPOSE.**

(iii) **LEGAL COMPLIANCE OF THE ASSETS. THE COMPLIANCE OR NON-COMPLIANCE OF SELLER OR THE OPERATION OF THE ASSETS OR ANY PART THEREOF IN ACCORDANCE WITH, AND THE CONTENTS OF, (I) ALL CODES, LAWS, ORDINANCES, REGULATIONS, AGREEMENTS, LICENSES, PERMITS, APPROVALS AND APPLICATIONS OF OR WITH ANY GOVERNMENTAL AUTHORITIES ASSERTING JURISDICTION OVER THE ASSETS, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO ZONING, BUILDING, PUBLIC WORKS, PARKING, FIRE AND POLICE ACCESS, HANDICAP ACCESS, LIFE SAFETY, SUBDIVISION AND SUBDIVISION SALES, AND HAZARDOUS MATERIALS, DANGEROUS, AND TOXIC SUBSTANCES, MATERIALS, CONDITIONS OR WASTE, INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF HAZARDOUS MATERIALS IN, ON, UNDER OR ABOUT THE ASSETS THAT WOULD CAUSE STATE OR FEDERAL AGENCIES TO ORDER A CLEAN UP OF THE ASSETS UNDER ANY APPLICABLE LEGAL REQUIREMENTS AND (II) ALL AGREEMENTS, COVENANTS, CONDITIONS, RESTRICTIONS (PUBLIC OR PRIVATE), CONDOMINIUM PLANS, DEVELOPMENT AGREEMENTS, SITE PLANS, BUILDING PERMITS, BUILDING RULES, AND OTHER INSTRUMENTS AND DOCUMENTS GOVERNING OR AFFECTING THE USE, MANAGEMENT, AND OPERATION OF THE ASSETS.**

(iv) **MATTERS DISCLOSED IN THE SCHEDULES AND THE ASSET FILE. THOSE MATTERS REFERRED TO IN THIS AGREEMENT AND THE DOCUMENTS LISTED ON THE SCHEDULES ATTACHED HERETO AND THE MATTERS DISCLOSED IN THE ASSET FILE.**

(v) **INSURANCE. THE AVAILABILITY, COST, TERMS AND COVERAGE OF LIABILITY, HAZARD, COMPREHENSIVE AND ANY OTHER INSURANCE OF OR WITH RESPECT TO THE ASSETS OR ANY PORTION THEREOF.**

(vi) **CONDITION OF TITLE. SUBJECT TO SECTION 8.3, THE CONDITION OF TITLE TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, VESTING, LEGAL DESCRIPTION, MATTERS AFFECTING TITLE, TITLE DEFECTS, LIENS, ENCUMBRANCES, BOUNDARIES, ENCROACHMENTS, MINERAL RIGHTS, OPTIONS, EASEMENTS, AND ACCESS; VIOLATIONS OF RESTRICTIVE COVENANTS, ZONING**

ORDINANCES, SETBACK LINES, OR DEVELOPMENT AGREEMENTS; THE AVAILABILITY, COST, AND COVERAGE OF TITLE INSURANCE; LEASES, RENTAL AGREEMENTS, OCCUPANCY AGREEMENTS, RIGHTS OF PARTIES IN POSSESSION OF, USING, OR OCCUPYING THE PROPERTY; AND STANDBY FEES, TAXES, BONDS AND ASSESSMENTS.

### SECTION 7.4　　RELEASE.

(a)　　BUYER HEREBY AGREES THAT SELLER, AND EACH OF SELLER'S PARTNERS, MEMBERS, TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, PROPERTY MANAGERS, ASSET MANAGERS, AGENTS, ATTORNEYS, AFFILIATES AND RELATED ENTITIES, HEIRS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE "RELEASEES") SHALL BE, AND ARE HEREBY, FULLY AND FOREVER RELEASED AND DISCHARGED FROM ANY AND ALL LIABILITIES, LOSSES, CLAIMS (INCLUDING THIRD PARTY CLAIMS), DEMANDS, DAMAGES (OF ANY NATURE WHATSOEVER), CAUSES OF ACTION, COSTS, PENALTIES, FINES, JUDGMENTS, REASONABLY ATTORNEYS' FEES, CONSULTANTS' FEES AND COSTS AND EXPERTS' FEES (COLLECTIVELY, THE "CLAIMS") WITH RESPECT TO ANY AND ALL CLAIMS, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY BE CONNECTED WITH THE ASSETS OR THE PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, THE PHYSICAL, ENVIRONMENTAL AND STRUCTURAL CONDITION OF THE ASSETS OR THE PROPERTY OR ANY LAW OR REGULATION APPLICABLE THERETO, INCLUDING, WITHOUT LIMITATION, ANY CLAIM OR MATTER (REGARDLESS OF WHEN IT FIRST APPEARED) RELATING TO OR ARISING FROM (A) THE PRESENCE OF ANY ENVIRONMENTAL PROBLEMS, OR THE USE, PRESENCE, STORAGE, RELEASE, DISCHARGE, OR MIGRATION OF HAZARDOUS MATERIALS ON, IN, UNDER OR AROUND THE PROPERTY REGARDLESS OF WHEN SUCH HAZARDOUS MATERIALS WERE FIRST INTRODUCED IN, ON OR ABOUT THE PROPERTY, (B) ANY PATENT OR LATENT DEFECTS OR DEFICIENCIES WITH RESPECT TO THE ASSETS , (C) ANY AND ALL MATTERS RELATED TO THE ASSETS OR ANY PORTION THEREOF, INCLUDING WITHOUT LIMITATION, THE CONDITION AND/OR OPERATION OF THE ASSETS AND EACH PART THEREOF, (D) ANY AND ALL MATTERS RELATED TO THE CURRENT OR FUTURE ZONING OR USE OF THE PROPERTY, AND (E) THE PRESENCE, RELEASE AND/OR REMEDIATION OF ASBESTOS AND ASBESTOS CONTAINING MATERIALS IN, ON OR ABOUT THE PROPERTY REGARDLESS OF WHEN SUCH ASBESTOS AND ASBESTOS CONTAINING MATERIALS WERE FIRST INTRODUCED IN, ON OR ABOUT THE PROPERTY; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL RELEASEES BE RELEASED FROM ANY CLAIMS ARISING PURSUANT TO THE PROVISIONS OF THIS AGREEMENT OR SELLER'S OBLIGATIONS, IF ANY, UNDER THE CLOSING DOCUMENTS.  BUYER HEREBY WAIVES AND AGREES NOT TO COMMENCE ANY ACTION, LEGAL PROCEEDING, CAUSE OF ACTION OR SUITS IN LAW OR EQUITY, OF WHATEVER KIND OR NATURE, INCLUDING, BUT NOT LIMITED TO, A PRIVATE RIGHT OF ACTION UNDER THE FEDERAL SUPERFUND LAWS,

42 U.S.C. SECTIONS 9601 ET SEQ. AND SIMILAR STATE ENVIRONMENTAL LAWS (AS SUCH LAWS AND STATUTES MAY BE AMENDED, SUPPLEMENTED OR REPLACED FROM TIME TO TIME), DIRECTLY OR INDIRECTLY, AGAINST THE RELEASEES OR THEIR AGENTS IN CONNECTION WITH CLAIMS DESCRIBED ABOVE.

(b) IN THIS CONNECTION AND TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, BUYER HEREBY AGREES THAT BUYER REALIZES AND ACKNOWLEDGES THAT FACTUAL MATTERS NOW KNOWN TO IT MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGE, COSTS, LOSSES AND EXPENSES WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED AND UNSUSPECTED, AND BUYER FURTHER AGREES THAT THE WAIVERS AND RELEASES HEREIN HAVE BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF THAT REALIZATION AND THAT BUYER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE AND ACQUIT SELLER FROM ANY SUCH UNKNOWN CLAIMS, DEBTS, AND CONTROVERSIES WHICH MIGHT IN ANY WAY BE INCLUDED AS A MATERIAL PORTION OF THE CONSIDERATION GIVEN TO SELLER BY BUYER IN EXCHANGE FOR SELLER'S PERFORMANCE HEREUNDER.

(c) SELLER HAS GIVEN BUYER MATERIAL CONCESSIONS REGARDING THIS TRANSACTION IN EXCHANGE FOR BUYER AGREEING TO THE PROVISIONS OF THIS SECTION 7.4. THE PROVISIONS OF THIS SECTION 7.4 SHALL SURVIVE THE CLOSING AND SHALL NOT BE DEEMED MERGED INTO ANY INSTRUMENT OR CONVEYANCE DELIVERED AT THE CLOSING.

### ARTICLE VIII

### TITLE AND PERMITTED EXCEPTIONS

Permitted Exceptions. The Property shall be sold and is to be conveyed, and Buyer agrees to purchase the Property, subject only to the Permitted Exceptions.

Section 8.1 Buyer's Review of Title. (a) Generally. The Title Company shall deliver the Title Commitment to the Buyer within five (5) Business Days from the Effective Date. Buyer shall have until the date which is ten (10) calendar days after delivery of the Title Commitment (the "Title Approval Period"), to give Seller written notice ("Buyer's Title Notice") of Buyer's approval, disapproval or conditional approval of any matters shown in the Commitment which were not present as of the date that this Agreement was signed by Buyer identifying each specific matter (each, a "Matter") of which Buyer disapproves, which approval, conditional approval or disapproval shall be in Buyer's sole and absolute discretion. The failure of Buyer to give Buyer's Title Notice on or before the end of the Title Approval Period shall be deemed to constitute Buyer's approval of the condition of title and all exceptions in the Title Commitment shall be deemed to be Permitted Exceptions.

(b)    <u>New Title Matters</u>.  If, after the expiration of the Title Approval Period and prior to the Closing Date, Title Company issues any supplement or amendment to the Commitment which reflects new exceptions to title which the Buyer has not otherwise approved (a "<u>New Matter</u>"), then Buyer shall give Seller written notice (a "<u>New Matter Notice</u>") of that fact no later than five (5) calendar days after becoming aware of the New Matter or by the Closing Date, whichever is the first to occur, indicating whether Buyer approves and accepts, or disapproves of, such New Matter, in Buyer's sole and absolute discretion.  If Buyer does not timely deliver to Seller a New Matter Notice approving or disapproving of such New Matter, the Buyer shall be deemed to have approved of such New Matter and such New Matter shall be deemed to be a Permitted Exception.

(c)    <u>Handling of Title Matters</u>.  If Buyer has disapproved of any Matter or New Matter as provided herein (any Matter or New Matter being referred to as a "<u>Title Matter</u>") and Seller fails to give written notice (an "<u>Election to Cure Notice</u>") to Buyer (A) within three (3) business days after Seller's receipt of the applicable Matter Notice or New Matter Notice (each, a "<u>Title Matter Notice</u>"), or (B) by the Closing Date, whichever is the first to occur, informing Buyer that Seller wishes to cure or to attempt to cure the applicable Title Matter, then Buyer shall have the right exercisable in its sole and absolute discretion, upon delivery to Seller, on or before two (2) business days following expiration of the three (3) business day period referenced in clause (A) above or by the Closing Date, whichever is the first to occur, to either (i) waive its prior disapproval or conditional approval, in which event said disapproved or conditionally approved matters shall be deemed approved and Permitted Exceptions, or (ii) terminate this Agreement and the Escrow created pursuant hereto, in which event Buyer shall be entitled to a return of the Earnest Money.  Failure to take either one of the actions described in clauses (i) and (ii) above shall be deemed to be Buyer's election to take the action described in clause (ii) above, subject to the provisions of subparagraph (d) below.

(d)    <u>Seller's Right to Cure Title Matters</u>.  If Seller has timely given to Buyer an Election to Cure Notice, Seller shall have fifteen (15) calendar days after delivering said Election to Cure Notice to Buyer to cure the Title Matter by (A) causing the Title Matter to be removed from the Commitment or any supplement thereto, or (B) causing the Title Company to insure Buyer against loss or damage (up to the policy limit) resulting from the Title Matter in a manner acceptable to Buyer in Buyer's reasonable discretion.  The Closing Date shall be extended as necessary in order to take into account such fifteen (15) day cure period.  Having once informed Buyer that Seller wishes to cure or to attempt to cure a Title Matter, but Seller is unable to do so or elects not to do so, Seller may at any time, by written notice to that effect given to Buyer, without any liability to Buyer, elect not to cure or attempt to cure that Title Matter (a "<u>Rescission Notice</u>"), and Buyer may, by written notice to Seller, within five (5) calendar days following receipt of the Rescission Notice either (i) waive its prior disapproval or conditional approval, in which event said disapproved or conditionally approved matters shall be deemed approved, or (ii) terminate this Agreement and the Escrow created pursuant hereto, in which event Buyer shall be entitled to the return of the Earnest Money.  Failure to take either one of the actions described in clauses (i) and (ii) above shall be deemed to be Buyer's election to take the action described in clause (ii) above.  Seller shall have no obligation to enter into any indemnity, bond or other undertaking in connection with the cure of any Title Matter.

(e)     Termination of Agreement.  If this Agreement is terminated by Buyer pursuant to the provisions of this Section 8.1, (i) Title Company shall return the Earnest Money to Buyer unless such event occurs after the Earnest Money becomes non-refundable, and (ii) this Agreement and the escrow created pursuant hereto shall terminate and be of no further force or effect, and neither party shall have any further obligation to the other except for those obligations that survive the termination of this Agreement as expressly provided in this Agreement. Except as expressly set forth in this Section 8.2, nothing contained in this Agreement shall be deemed to require Seller to take or bring any action or proceeding or any other steps to remove any title exception or to expend any moneys therefor, nor shall Buyer have any right of action against Seller, at law or in equity, for Seller's inability to convey title to the Property subject only to the Permitted Exceptions.

Section 8.2     Violations.  Buyer agrees to purchase the Property subject to any and all Violations, or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Property. Seller shall have no duty to remove or comply with or repair any condition, matter or thing whether or not noted, which, if noted, would result in a Violation being placed on the Property. Seller shall have no duty to remove or comply with or repair any of the aforementioned Violations (and shall have no duty to remove or close any open building permits), or other conditions, and Buyer shall accept the Property subject to all such Violations (and any open building permits), the existence of any conditions at the Property which would give rise to such Violations, if any, and any governmental claims arising from the existence of such Violations, in each case without any abatement of or credit against the Purchase Price.

Section 8.3     Title Policy.

At Closing, Buyer may arrange for the Title Company to issue, or irrevocably commit to issue, to Buyer, an ALTA owner's standard form title policy (the "Title Policy") with respect to the Property, which shall be in the form of the Title Commitment, in the amount of the Purchase Price with respect to the Property, and Buyer's rights to the Property is vested in Buyer subject only to the Permitted Exceptions.  Seller shall pay the premium of such owner's standard form title policy.  Buyer shall be entitled to request that the Title Company provide such endorsements (or amendments) to any Title Policy as Buyer may reasonably require, provided that (a) such endorsements (or amendments) shall be paid for by Buyer and at no cost to, and shall impose no additional liability on, Seller, (b) Buyer's obligations under this Agreement shall not be conditioned upon Buyer's ability to obtain such endorsements and, if Buyer is unable to obtain such endorsements, Buyer shall nevertheless be obligated to proceed to close the transactions contemplated by this Agreement without reduction of or set off against the Purchase Price, and (c) the Closing shall not be delayed as a result of Buyer's request.

Section 8.4     Cooperation. Buyer and Seller shall cooperate to the extent reasonable and necessary with the Title Company in connection with obtaining title insurance insuring title to the Property subject only to the Permitted Exceptions.  In furtherance and not in limitation of the foregoing, at or prior to the Closing, Buyer and Seller, as applicable, and to the extent requested by the Title Company, shall deliver to the Title Company (i) evidence sufficient to establish (x) the legal existence of Buyer and Seller and (y) the authority of the respective signatories of Seller and Buyer to bind Seller and Buyer, as the case may be, (ii) a certificate of

good standing of Seller issued by the state where the Seller is formed (iii) the Affidavit of Value and (iv) a certificate of good standing of Seller issued by the state where the Assets are located.

**ARTICLE IX**

**TRANSACTION COSTS; RISK OF LOSS**

Section 9.1    Transaction Costs.  Buyer and Seller agree to comply with all applicable real estate transfer tax laws applicable to the sale of the Assets.  At Closing, all transfer, documentary, sales, use, stamp, registration and other such transfer taxes, all conveyance fees, recording charges and other fees and charges shall be paid by Buyer.  In addition to the foregoing and their respective apportionment obligations under Article X hereunder, (i) Seller and Buyer shall each be responsible for (x) the payment of the costs of their respective legal counsel, advisors and other professionals employed thereby in connection with the transactions contemplated by this Agreement, and (y) one-half of the reasonable fees and expenses of the Escrow Agent; (ii) Buyer shall be responsible for payment of the ALTA standard owner's title insurance premiums and search and exam fees; and (iii) Buyer shall be responsible for all costs and expenses associated with (A) Buyer's due diligence, reports and examinations (B) any title insurance premiums for extended coverage in its Owner's and Lender's title policies, (C) recording the Assignment and Assumption of Lease, (D) the issuance of a franchise agreement or license agreement for the Hotel, including, but not limited to, application fees, transfer fees, and costs of implementing a property improvement plan, (E) obtaining the consent of any third party to the transfer and assignment of any Assumed Contracts and (F) any financing obtained by Buyer (including, without limitation, all applicable mortgage recording, intangibles or similar taxes).  Any other closing costs not specifically allocated by this Agreement shall be allocated in accordance with closing customs for similar properties located in the same metropolitan area as the Property.

(b)    Each party to this Agreement shall indemnify the other parties and their respective successors and assigns from and against any and all loss, damage, cost, charge, liability or expense (including court costs and reasonable attorneys' fees) which such other party may sustain or incur as a result of the failure of either party to timely pay any of the aforementioned taxes, fees or other charges for which it has assumed responsibility under this Section 9.1. The provisions of this Section 9.1 shall survive the Closing or the termination of this Agreement.

Section 9.2    Risk of Loss.

(a)    If, on or before the Closing Date, the Property or any portion thereof shall be (i) damaged or destroyed by fire or other casualty or (ii) taken as a result of any condemnation or eminent domain proceeding, Seller shall promptly upon learning thereof notify Buyer and, at Closing, Seller will credit against the Purchase Price payable by Buyer at the Closing an amount equal to the net proceeds (other than on account of business or rental interruption relating to the period prior to Closing), if any, received by Seller as a result of such casualty or condemnation, together with a credit for any deductible under such insurance, less any amounts spent to restore. If as of the Closing Date, Seller has not received any such insurance or condemnation proceeds, then the parties shall nevertheless consummate on the Closing Date the conveyance of the Assets

(without any credit for such insurance or condemnation proceeds except for a credit for any deductible under such insurance) and Seller will at Closing assign to Buyer all rights of Seller, if any, to the insurance or condemnation proceeds (other than on account of business or rental interruption relating to the period prior to Closing) and to all other rights or claims arising out of or in connection with such casualty or condemnation.

(b)     Notwithstanding the provisions of Section 9.2(a), if, on or before the Closing Date, the Property or any portion thereof shall be (i) damaged or destroyed by a Material Casualty or (ii) taken as a result of a Material Condemnation, either Buyer or Seller shall have the right, exercised by notice to the other no more than five (5) days after Buyer has received notice of such Material Casualty or Material Condemnation (and in no event later than the Closing), to terminate this Agreement, in which event the Earnest Money shall be refunded to Buyer and neither party shall have any further rights or obligations hereunder other than those which expressly survive the termination of this Agreement. If Buyer or Seller fails to timely terminate this Agreement in accordance with this Section 9.2(b), the provisions of Section 9.2(a) shall apply. As used in this Section 9.2(b), a "Material Casualty" shall mean any damage to the Property or any portion thereof by fire or other casualty that, in Seller's reasonable judgment, is expected to cost in excess of ten percent (10%) of the Purchase Price to repair. As used in this Section 9.2(b), a "Material Condemnation" shall mean a taking of the Property or any material portion thereof, or a taking that, in Seller's reasonable judgment (a) materially adversely affects pedestrian or vehicular access to the Property on a permanent basis, as a result of a condemnation or eminent domain proceedings, (b) permanently and materially impairs the use of the Property, and (c) which cannot be restored to substantially the same use as before the taking.

## ARTICLE X

## **ADJUSTMENTS**

Except as otherwise provided below, the following are to be adjusted and prorated between Seller and Buyer as of 11:59 P.M. (local time) on the day preceding the Closing (the "Cut-Off Time"), with the Seller being responsible for all charges and entitled to all income on the day in which the Cut-Off Time occurs and the Buyer being responsible for all charges and entitled to all income on the day in which the Closing occurs, based upon a 365 day year. The net amount thereof under Article X shall be added to (if such net amount is in Seller's favor) or deducted from (if such net amount is in Buyer's favor) the Purchase Price payable at Closing:

Section 10.1     Fixed Rents and Additional Rents.

(a)     Fixed rents (collectively, "Fixed Rents") and Additional Rents (as hereinafter defined; Fixed Rents and Additional Rents being together referred to herein as "Rents") paid or payable by Tenants in connection with their occupancy of the Property shall be adjusted and prorated on an if, as and when collected basis. Any Rents collected by Buyer or Seller after the Closing from any tenant who owes Rents for periods prior to the Closing, shall be applied (i) first, in payment of Rents owed by such tenant for the month in which the Closing occurs, (ii) second, in payment of current Rents at the time of receipt, (iii) third, to delinquent Rents, if any, which became due prior to the Closing and (iv) fourth, then to delinquent Rents, if any, which became due and payable after the Closing. Each such amount, less any costs of

collection (including reasonable counsel fees) reasonably allocable thereto, shall be adjusted and prorated as provided above, and the party who receives such amount shall promptly pay over to the other party the portion thereof to which it is so entitled. For the purposes of this provision, the term "Additional Rent" shall mean amounts payable under any Space Lease for (i) the payment of additional rent based upon a percentage of the tenant's business during a specified annual or other period (sometimes referred to as "percentage rent"), (ii) so-called common area maintenance or "CAM" charges, (iii) so-called "escalation rent" or additional rent based upon increases in real estate taxes or operating expenses or labor costs or cost of living or porter's wages or otherwise and (iv) any general excise taxes collected from the Tenants. As to any Additional Rent in respect of an accounting period that shall have expired prior to the Closing but which is payable after the Closing, Buyer shall pay the entire amount over to Seller upon Buyer's receipt thereof.

(b)     Buyer shall bill Tenants who owe Rents for periods prior to the Closing on a monthly basis following the Closing and use commercially reasonable efforts to attempt to collect such past due Rents, but shall not be obligated to engage a collection agency or take legal action to collect such amount. Notwithstanding the foregoing, if Buyer shall be unable to collect such past due Rents, Seller shall have the right to pursue such Tenant to collect such delinquencies (including, without limitation, the prosecution of one or more lawsuits, but Seller shall not take any action to evict any such Tenant or terminate any such Space Lease). Seller shall furnish to Buyer all information relating to the period prior to the Closing that is reasonably necessary for the billing of such Rent and Buyer will deliver to Seller, concurrently with the delivery to Tenants, copies of all statements relating to Rent for a period prior to the Closing. Buyer shall bill Tenants for Rents for accounting periods prior to the Closing in accordance with and on the basis of such information furnished by Seller.

(c)     To the extent that any portion of Additional Rent is required to be paid monthly by Tenants on account of estimated amounts for any calendar year (or, if applicable, any lease year or tax year or any other applicable accounting period), and at the end of such calendar year (or lease year, tax year or other applicable accounting period, as the case may be), such estimated amounts are to be recalculated based upon the actual expenses, taxes and other relevant factors for that calendar (lease or tax) year or other applicable accounting period, with the appropriate adjustments being made with such Tenants, then such portion of the Additional Rent shall be prorated between Seller and Buyer at the Closing based on such estimated payments actually paid by Tenants (i.e., with Seller entitled to retain all monthly or other periodic installments of such amounts paid by Tenants with respect to periods prior to the calendar month or other applicable installment period in which the Closing occurs (on a pro-rata basis for any partial months), Seller to pay to Buyer at the Closing all monthly or other periodic installments of such amounts theretofore received by Seller with respect to periods following the calendar month or other applicable installment period in which the Closing occurs and Seller and Buyer to apportion as of the Closing all monthly or other periodic installments of such amounts paid by Tenants with respect to the calendar month or other applicable installment period in which the Closing occurs). At the time(s) of final calculation and collection from (or refund to) each Tenant of the amounts in reconciliation of actual Additional Rent for a period for which estimated amounts paid by such Tenant have been prorated, there shall be a re-proration between Seller and Buyer. If, with respect to any Tenant, the recalculated Additional Rent exceeds the estimated amount paid by such Tenant, upon collection from the tenant, such excess shall be

apportioned between Seller and Buyer as of the Closing in accordance with paragraph (a), (b) and (c) of this Section 10.1. If, with respect to any Tenant, the recalculated Additional Rent is less than the estimated amount paid by such Tenant, such shortfall shall be apportioned between Seller and Buyer as of the Closing, with Seller paying to Buyer the portion of such shortfall so allocable to Seller.

(d)     Until such time as all amounts required to be paid to Seller by Buyer pursuant to this Section 10.1 shall have been paid in full, Buyer shall furnish to Seller, upon Seller's request, a reporting of rents which have been collected by Buyer after the Closing with respect to Space Leases with delinquent Rents as of the Closing. Seller shall also have the right from time to time following the Closing, upon reasonable prior notice to Buyer and during ordinary business hours, to review Buyer's rental records with respect to such Space Leases.

(e)     The obligations of Buyer under this Section 10.1 shall survive Closing.

Section 10.2     Taxes and Assessments.   Real estate (ad valorem) and personal property taxes and public and private assessments assessed shall be adjusted and prorated based on (a) the periods of ownership by Seller and Buyer and (b) the most current official real property tax information available from the county assessor's office where the Property is located or other assessing authorities. If real property tax and assessment figures for the taxes or assessments to be apportioned between Buyer and Seller pursuant to this Section 10.2 are not available, real property taxes shall be prorated based on the most recent assessment, subject to further and final adjustment when the tax rate and/or assessed valuation for such taxes and assessments for the Property is fixed. In the event that the Property or any part thereof shall be or shall have been affected by an assessment or assessments, whether or not the same become payable in annual installments, Seller shall, at the Closing, be responsible for any such assessment (or any installments thereof) due prior to the Closing and Buyer shall be responsible for any such assessment (or any installments thereof) due on or after the Closing. The obligations of Buyer under this Section 10.2 shall survive Closing.

Section 10.3     Utilities.   With respect to electricity, telephone, television, gas, fuel, water and sewer services which are metered, trash removal and other utilities, Seller shall use reasonable efforts to have the respective companies providing such utilities read the meters on or immediately prior to the Cut-Off Time. Seller shall be responsible for all charges incurred prior to the Cut-Off Time based on such final meter readings and Buyer shall be responsible for all charges thereafter. To the extent such meters are not read at the Property and final bills rendered as of the Cut-Off Time, such charges with respect to the Property shall be prorated effective as of the Cut-Off Time utilizing an estimate of such charges reasonably approved by both Buyer and Seller based on prior utility bills, and any deposits or credits with respect to the foregoing services will be credited to Seller. Upon the taking of a subsequent actual reading, such apportionment shall be adjusted to reflect the actual rate for the billing period in which the Closing Date occurs, and Seller, or Buyer, as the case may be, shall promptly deliver to the other the amount determined to be due upon such adjustment.

Section 10.4     Contracts.   Charges and payments under all Assumed Contracts that have not otherwise been apportioned as provided in Section 10.3 shall be prorated as of the Cut-Off Time.

Section 10.5   Miscellaneous Revenues.   Revenues, if any, arising out of telephone booths, vending machines, parking, or other income producing agreements, shall be removed from such machines (to the extent such income is collected by machine) for the benefit of Seller at the Cut-Off Time or such income shall otherwise be prorated as of the Cut-Off Time. To the extent such amounts are unknown at the time of the Closing, Seller and Buyer shall adjust such amounts once known.

Section 10.6   Security Deposits.   Buyer shall receive a credit equal to the actual amounts of the security deposits that have not been applied under the Space Leases and which are being held by Seller pursuant to the Space Leases to the extent such amounts are not assigned or transferred to Seller at Closing.

Section 10.7   Leasing Costs.   Seller shall be responsible for all Leasing Costs before the Cut-Off Time relating to Space Leases and leases of Personal Property, or renewals, amendments, expansions, extensions, assignments and transfers of Space Leases and leases of Personal Property, entered into or which first become binding, prior to the Cut-Off Time (the "Seller's Leasing Costs").   Buyer shall be responsible for all Leasing Costs other than Seller's Leasing Costs (the "Buyer's Leasing Costs"), and shall assume the economic effect of any "free rent" or other concessions pertaining to the period from and after the Closing Date and expressly disclosed in the Space Leases.   Notwithstanding anything in this Section 10.7 to the contrary, Buyer shall be responsible for all Leasing Costs relating to renewals, amendments, expansions and extensions of Space Leases, in each case to the extent such Leasing Costs relate to renewal, expansion or extension rights of Tenants under such Space Leases that are exercised or amendments that are entered into, after the Effective Date.   To the extent Seller's Leasing Costs have not been fully paid as of the Closing Date, Buyer shall receive a credit at the Closing against the Purchase Price in the amount of the balance of Seller's Leasing Costs remaining to be paid and Buyer shall assume all obligations of Seller to pay the balance of Seller's Leasing Costs as to which Buyer shall have received such credit and to perform the obligations associated with the same. The obligations of Buyer under this Section 10.7 shall survive the Closing.

Section 10.8   Accounts Receivable.

(a)   Guest Ledger.   All revenues received or to be received from transient guests on account of room rents, facilities occupied and the use of the premises (including without limitation parking areas, mini-bar sales, phone and other communication charges and the like) for the period prior and including the Cut-Off Time shall belong to Seller.   At Closing, Seller shall receive a credit in an amount equal toall amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs, .   For the period beginning on the day immediately following the Cut-Off Time, such revenues collected from the Guest Ledger shall belong to Buyer and Buyer shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.   In the event that an amount less than the total amount due from a guest is collected and such guest continued in occupancy after the Cut-Off Time, such amount shall be applied first to any amount owing by such Person to Seller and thereafter to such Person's amounts accruing to Buyer.   The provisions of this Section 10.8(a) will survive the Closing for one hundred eighty (180) days.

(b)     Food and Beverage Receivables.  Seller shall receive all income arising from restaurant and bar facilities until such bars or facilities are shut down whether such occurs before or after the Cut-Off Time.  If any bar or restaurant facilities do not close, such income shall be deemed closed as of the Cut-Off Time and Seller shall receive the income from the facilities until the Cut-Off Time and Buyer shall receive the income from the facilities after the Cut-Off Time.  Notwithstanding the foregoing, restaurant and bar receivables that are Guest Ledger receivables shall be allocated in accordance with Section 10.8(a).

(c)     Accounts Receivable (Other than Guest Ledger and Food and Beverage).  Seller and Buyer acknowledge and agree that Buyer is not acquiring from Seller any accounts receivable related to the Hotel.  After the Closing Date, Seller shall collect any Accounts Receivable that accrued before the Cut-Off Time.  Likewise, after the Closing Date, Buyer shall collect any Accounts Receivable that accrued on or after the Cut-Off Time.  If either (i) Seller receives an Account Receivable that accrued on or after the Cut-Off Time, or (ii) Buyer receives an Account Receivable that accrued before the Cut-Off Time, then the party in receipt of such Account Receivable shall forward the payment received in error to the other party within ten (10) days following such receipt.

Section 10.9    Consumables.  The parties agree that the cost of any Consumables located at the Property as of the Cut-Off Time is included in the Purchase Price and no additional amounts shall be payable by Buyer for the Consumables.

Section 10.10   Accounts Payable.  Seller shall be responsible for all Accounts Payable (as shown on the books and records of the Property as of the Cut-Off Time) to the extent attributable to the period preceding the Cut-Off Time.  Buyer shall be charged with any prepaid Accounts Payable to the extent those Accounts Payable are attributable to the period after the Cut-Off Time.  From and after the Closing Date, Buyer shall be responsible for paying when due all other accounts payable arising out of the operation of the Property from and after the Cut-Off Time.

Section 10.11   Bookings; Booking Deposits.  At the Closing, Buyer shall assume all of the obligations of Seller under the Bookings as of the Cut-Off Time, including obligations with respect to any prepaid amounts and deposits under the Booking Deposits not earned as of the Cut-Off Time, and Buyer shall receive a credit against the Purchase Price at the Closing in an amount equal to all such amounts (and, therefore, Seller shall have the right to retain any amounts relating to such items on deposit in Seller's accounts).  All prepaid amounts under the Booking Deposits for which Buyer has received credit as of the Cut-Off Time shall be the obligation of Buyer after the Closing.

Section 10.12   Sales, General Excise, Room and Occupancy Taxes.  Seller shall pay all sales taxes, general excise taxes and room occupancy, hotel, resort, and use taxes due and payable with respect to the Property for the period prior to the Cut-Off Time, and Buyer shall pay all sales taxes, general excise taxes, room occupancy, hotel, resort, and use taxes due and payable with respect to the Property for the periods on and after the Cut-Off Time; provided, however,  Seller, on the one hand, and Buyer, on the other hand, shall each pay fifty percent (50%) of all sales taxes, general excise taxes, room occupancy and use taxes due and payable

with respect to the Property for the night during which the Cut-Off Time occurs. Seller shall be entitled to receive any rebates or refunds on such taxes paid by Seller prior to Closing.

Section 10.13 Retail Merchandise . Seller shall receive a credit for all Retail Merchandise as of the Closing in an amount equal to Seller's actual cost (including sales and/or use tax) for such items.

Section 10.14 Association Fees. All owner's association or similar fees and assessments due and payable with respect to the Property with respect to the year in which the Closing occurs shall be adjusted and prorated as of the Cut-Off Time.

Section 10.15 Other Adjustments. If applicable, the Purchase Price shall be adjusted at the Closing to reflect the adjustment of any other item which, under the explicit terms of this Agreement, is to be apportioned at Closing to effectuate the intent that, except as otherwise expressly provided herein, all items of operating revenue and operating expense of the Assets prior to the Cut-Off Time shall be for the account of and paid by Seller and all items of operating revenue and operating expense of the Assets with respect to the period after the Cut-Off Time shall be for the account of and paid by Buyer.

Section 10.16 Benefit Plans; Employees. Buyer shall be responsible for all liabilities that accrue after the Cut-Off Time to or in respect of Transferred Employees. The covenants and agreements contained in this Section 10.16 are not intended and shall not confer any benefit or right on any person or entity other than the parties to this Agreement. Except as expressly provided herein, Seller and the Manager shall be and remain solely responsible for payment of any other employee benefits accrued in connection with Employees, including former employees of the Manager and Seller at the Property for which Buyer is not otherwise responsible under this Agreement with respect to any period prior to the Closing Date. Additionally, and notwithstanding any provision in this Agreement to the contrary, Buyer shall not be obligated to hire or employ any Employee who, at the Cut-Off Time, is on a leave of absence, disability leave or lay-off. The provisions of this Section 10.16 will survive the Closing and will not be deemed merged into any instrument of conveyance delivered at the Closing.

Section 10.17 Re-Adjustment; Credits Against the Purchase Price. If any items to be adjusted pursuant to this Article X are not determinable at the Closing, the adjustment shall be made subsequent to the Closing when the charge is determined. Any errors or omissions in computing adjustments or readjustments at the Closing or thereafter shall be promptly corrected, and any corrective payments shall be promptly made, provided that the party seeking to correct such error or omission or to make such readjustment shall have notified the other party of such error or omission or readjustment on or prior to the date that is following the Closing.

Section 10.18 Post-Closing Statement. Not earlier than sixty (60) days following the Closing and not later than ninety (90) days following the Closing, Buyer shall deliver to Seller a post-closing statement reflecting an accounting and substantiation covering all of the prorations and other adjustments set forth in this Article X in a form and substance satisfactory to Seller, including any year-end or similar reconciliations. The provisions of this Article X and the obligations of Seller and Buyer hereunder shall survive the Closing until one hundred eighty (180) days after the Closing Date.

# ARTICLE XI

# INDEMNIFICATION

Section 11.1    Indemnification by Seller.  Following the Closing and subject to Sections 11.3, 11.4, 11.5 and 11.6, Seller shall indemnify and hold Buyer and its Affiliates and its officers, directors, employees, representatives and agents (collectively, "Buyer-Related Entities") harmless from and against any and all costs, fees, expenses, damages, deficiencies, interest and penalties (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by any such indemnified party in connection with any and all losses, liabilities, claims, damages and expenses ("Losses"), arising out of or resulting from the willful misconduct or gross negligence of the Seller relating to (a) any breach of any representation or warranty of Seller contained in this Agreement or in any Closing Document and (b) any breach of any covenant of Seller contained in this Agreement or in any Closing Document which expressly survives the Closing.

Section 11.2    Indemnification by Buyer.  From and after the Closing and subject to Sections 11.3, 11.4, 11.5 and 11.6, Buyer shall indemnify and hold Seller and its Affiliates and its members and partners, and the members, partners, shareholders, officers, directors, employees, representatives and agents of each of the foregoing (collectively, "Seller-Related Entities") harmless from any and all Losses arising out of or resulting from (a) any breach of any representation or warranty by Buyer contained in this Agreement or in any Closing Document and (b) any breach of any covenant of Buyer contained in this Agreement or in any Closing Document which expressly survives the Closing.

Section 11.3    Limitations on Indemnification.

(a)    Seller shall not be required to indemnify Buyer or any Buyer-Related Entities under Section 11.1, unless the aggregate of all amounts for which an indemnity would otherwise be payable by Seller under Section 11.1 exceeds $20,000.00 ("the Basket Limitation") and, in such event, Seller shall be responsible only for such amount in excess of the Basket Limitation.  In no event shall the liability of Seller with respect to the indemnification provided for in Section 11.1 exceed $100,000.00 in the aggregate ("the Cap Limitation"); provided that the Basket Limitation and Cap Limitation shall not apply to Seller's obligations under Article X. If, prior to the Closing, Buyer is aware of any inaccuracy or breach of any representation, warranty or pre-closing covenant of Seller contained in this Agreement (a "Buyer-Waived Breach") and nonetheless proceeds with and consummates the Closing, then Buyer and any Buyer-Related Entities shall be deemed to have waived and forever renounced any right to assert a claim for indemnification under this Article XI for, or any other claim or cause of action under this Agreement, whether at law or in equity, on account of any such Buyer-Waived Breach.

(b)    Buyer shall not be required to indemnify Seller or any Seller-Related Entities under Section 11.2, unless the aggregate of all amounts for which an indemnity would otherwise be payable by Buyer under Section 11.2 exceeds the Basket Limitation and, in such event, Buyer shall be responsible only for such amount in excess of the Basket Limitation.  In no event shall the liability of Buyer with respect to the indemnification provided for in Section 11.2 exceed in the aggregate the Cap Limitation; provided that the Basket Limitation and Cap

Limitation shall not apply to Buyer's obligations under Article X. If, prior to the Closing, Seller is aware of any inaccuracy or breach of any representation, warranty or pre-closing covenant of Buyer contained in this Agreement (a "Seller-Waived Breach") and nonetheless proceeds with and consummates the Closing, then Seller and any Seller-Related Entities shall be deemed to have waived and forever renounced any right to assert a claim for indemnification under this Article XI for, or any other claim or cause of action under this Agreement, whether at law or in equity, on account of any Seller-Waived Breach.

Section 11.4    Survival.

(a)    Notwithstanding anything in this Agreement to the contrary, the representations, warranties and covenants of Seller set forth in or made pursuant to this Agreement, shall survive the Closing Date for a period of one hundred eighty (180) days (unless, with respect to any covenants that survive the Closing, a longer or shorter survival period is expressly provided for in this Agreement) and shall not be deemed merged into any instrument of conveyance delivered at the Closing. No action or proceeding thereon shall be valid or enforceable, at law or in equity, if a legal proceeding is not commenced on or before the date which is one hundred eighty (180) days following the Closing Date.

(b)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties and covenants of Buyer set forth in or made pursuant to this Agreement, shall survive the Closing Date for a period of one hundred eighty (180) days (unless, with respect to any covenants that survive the Closing, a longer or shorter survival period is expressly provided for in this Agreement) and shall not be deemed merged into any instrument of conveyance delivered at the Closing. No action or proceeding thereon shall be valid or enforceable, at law or in equity, if a legal proceeding is not commenced on or before the date which is one hundred eighty (180) days following the Closing Date.

Section 11.5    Indemnification as Sole Remedy.  If the Closing has occurred, the sole and exclusive remedy available to a party in the event of a breach by the other party to this Agreement or any representation, warranty, covenant or other provision of this Agreement or any Closing Document which survives the Closing shall be the indemnifications provided for under this Article XI. Neither party shall have any liability to the other party for consequential, indirect, exemplary, special or punitive damages, including, without limitation, loss of use, loss of revenue or profit, or diminution of value, resulting from any breach of any representation or warranty.

## ARTICLE XII

## TAX CERTIORARI PROCEEDINGS

Section 12.1    Prosecution and Settlement of Proceedings.  If any tax reduction proceedings (including, but not limited to, administrative and/or judicial proceedings or appeals) in respect of the Property, relating to any fiscal years ending prior to the fiscal year in which the Closing occurs, are pending at the time of the Closing, Seller reserves and shall have the right to continue to prosecute and/or settle the same. If any tax reduction proceedings in respect of the Property, relating to the fiscal year in which the Closing occurs, are pending at the time of

Closing, then Seller reserves and shall have the right to continue to prosecute and/or settle the same; provided, however, that Seller shall not settle any such proceeding without Buyer's prior written consent, which consent shall not be unreasonably withheld or delayed. Buyer shall reasonably cooperate with Seller in connection with the prosecution of any such tax reduction proceedings.

Section 12.2    Application of Refunds or Savings.    Any refunds or savings in the payment of taxes resulting from such tax reduction proceedings on account of taxes allocable to the period prior to the date of the Closing shall belong to and be the property of Seller, and any refunds or savings in the payment of taxes on account of taxes allocable to the period from and after the date of the Closing shall belong to and be the property of Buyer; provided, however, that if any such refund creates an obligation to reimburse any Tenants under Space Leases for any rents or additional rents paid or to be paid, that portion of such refund equal to the amount of such required reimbursement (after deduction of allocable expenses as may be provided in the Space Lease to such Tenant) shall, at Seller's election, either (a) be paid to Buyer and Buyer shall disburse the same to such tenants or (b) be paid by Seller directly to the Tenants entitled thereto.  All attorneys' fees and other expenses incurred in obtaining such refunds or savings shall be apportioned between Seller and Buyer in proportion to the gross amount of such refunds or savings payable to Seller and Buyer, respectively (without regard to any amounts reimbursable to Tenants); provided, however, that neither Seller nor Buyer shall have any liability for any such fees or expenses in excess of the refund or savings paid to such party unless such party initiated such proceeding.

Section 12.3    Survival.    The provisions of this Article XII shall survive the Closing.

# ARTICLE XIII

## DEFAULT

Section 13.1    Buyer Default.

(a)    This Agreement may be terminated by Seller prior to the Closing if (i) any of the conditions precedent to Seller's obligations set forth in Section 5.1 have not been satisfied or waived by Seller on or prior to the Closing Date or (ii) there is a material breach or default by Buyer in the performance of any of its obligations under this Agreement of which the Seller has provided the Buyer written notice of and the Buyer has failed to cure within three (3) calendar days of such notice; provided, however, that the Buyer shall not be entitled to such notice and opportunity to cure in connection with the failure of any condition precedent set forth in Section 5.1 to have been satisfied on or prior to the Closing Date and no such notice and cure rights shall extend the Closing Date.  Notwithstanding anything herein to the contrary, the Earnest Deposit shall not be refundable after it becomes non-refundable.

(b)    In the event this Agreement is terminated pursuant to Section 13.1(a), this Agreement shall be null and void and of no further force or effect and neither party shall have any rights or obligations against or to the other except (i) for those provisions hereof which by

their terms expressly survive the termination of this Agreement and (ii) as set forth in Section 13.1(c).

(c)     In the event Seller terminates this Agreement, as a result of a material breach or default by Buyer in any of its obligations under this Agreement, the Escrow Agent shall immediately disburse the Earnest Money to Seller, and upon such disbursement Seller and Buyer shall have no further obligations under this Agreement, except those which expressly survive such termination. Buyer and Seller hereby acknowledge and agree that it would be impractical and/or extremely difficult to fix or establish the actual damage sustained by Seller as a result of such default by Buyer, and agree that the Earnest Money is a reasonable approximation thereof. Accordingly, in the event that Buyer breaches this Agreement by materially defaulting in the performance of any of its obligations under this Agreement, the Earnest Money shall constitute and be deemed to be the agreed and liquidated damages of Seller, and shall be paid by the Escrow Agent to Seller as Seller's sole and exclusive remedy hereunder.

Section 13.2    Seller Default.

(a)     This Agreement may be terminated by Buyer prior to the Closing if (i) any of the conditions precedent to Buyer's obligations set forth in Section 5.2 have not been satisfied or waived by Buyer on or prior to the Closing Date or (ii) there is a material breach or default by Seller in the performance of its obligations under this Agreement of which the Buyer has provided the Seller written notice of and the Seller had failed to cure within fifteen (15) Business Days of such notice (but in all events such material breach or default is not cured prior to the Closing Date, if earlier), provided that the Seller shall not be entitled to such notice and opportunity to cure for failure to cause the sale of the Assets on the Closing Date; provided further that Buyer may not terminate this Agreement if, on the Closing Date, there exists a material default by Buyer under this Agreement.

(b)     Upon termination of this Agreement by Buyer pursuant to Section 13.2(a), the Escrow Agent shall disburse the Earnest Money to Buyer, and upon such disbursement Seller and Buyer shall have no further obligations under this Agreement, except those which expressly survive such termination and as set forth in Section 13.2(c).

(c)     If Seller shall materially default in the performance of its obligations under this Agreement to cause the sale of the Asset on the Closing Date, Buyer, at its option, as its sole and exclusive remedy, may (i) terminate this Agreement, direct the Escrow Agent to deliver the Earnest Money to Buyer and retain the Earnest Money, at which time this Agreement shall be terminated and of no further force and effect except for the provisions which explicitly survive such termination or (ii) seek to specifically enforce the terms and conditions of this Agreement; provided that such specific enforcement action must be initiated no later than thirty (30) days following such default or Buyer shall be deemed to have elected to terminate this Agreement as provided in Section 13.2(c)(i). In the event Buyer shall elect to terminate this Agreement, as provided in Section 13.2(c)(i), Seller shall reimburse to Buyer for all actual, third party, out-of-pocket costs and expenses reasonably incurred in connection with the transaction contemplated hereby and caused by Seller's material default of its obligations under this Agreement, limited in all events to a sum not exceeding $100,000, payment of which shall be due to Buyer within fifteen (15) days after receipt by Seller of a statement therefor from Buyer

together with reasonable supporting documentation and should Seller fail to pay the same when due, Buyer shall have the right to file a lawsuit to seek collection thereof.

**ARTICLE XIV**

**OTHER AGREEMENTS; EMPLOYEE MATTERS**

Section 14.1    Employee Matters.

(a)    Employees.    Buyer acknowledges that the Employees are currently employed by the Manager.

(b)    Hiring of Employees.    The parties intend that there will be continuity of employment with respect to all of the Employees, as set forth below.  It is agreed that prior to, or in connection with, the Closing, Buyer shall take no action to cause Seller or Manager to terminate the employment of any Employee, and neither Seller nor Manager shall be under any obligation to terminate any Employee prior to or on the Closing Date except for those terminated for good faith business reasons by Seller, in which case, Seller will cause the Manager to use its reasonable efforts to replace such terminated Employee(s).  It is further agreed that effective as of the Closing Date, Buyer (or its manager or Affiliate) shall offer (or continue the) employment at the Property to all Employees, including those on vacation, leave of absence, disability or layoff, who were employed by Manager at the Property on the day immediately preceding the Closing Date such that no application of or liability under the WARN Act will be triggered in connection with the sale of the Property.  Such offer of (or continued) employment shall be on the same terms (including compensation, salary, fringe benefits, job responsibility and location) as those provided to such Employees by Manager on the day immediately preceding the Closing Date.  Those Employees who accept Buyer's (or its manager's or Affiliate's) offer of employment and commence (or continue) employment with Buyer (or its manager or Affiliate) on the Closing Date shall hereafter be referred to as "Transferred Employees".  Buyer shall be liable for any amounts to which any Employee becomes entitled under any benefits or severance policy, plan, agreement, arrangement or program which exists or arises, or may be deemed to exist or arise, as a result of or in connection with the transactions contemplated by this Agreement, whether under, applicable law or otherwise.

(c)    Indemnity.    Buyer shall indemnify, defend and hold Seller and Seller-Related Entities harmless from and against any and all claims, actions, suits, demands, proceedings, losses, expenses, damages, obligations and liabilities (including costs of collection, attorneys' fees and other costs of defense) arising out of or otherwise in respect of (i) the termination of any Transferred Employees on or after the Closing Date; (ii) failure of Buyer (or the manager) to offer (or continue the) employment of any Employee on the same terms as said Employee enjoys on the day immediately preceding the Closing Date; (iii) failure of Buyer to comply with its obligations (including, but not limited to, any statutory or contractual obligations) with respect to the Transferred Employees; (iv) any claim made by any Transferred Employee for severance pay; and (v) any liability relating to the Transferred Employees that is incurred on or after the Closing Date.  Seller shall indemnify, defend and hold Buyer and Buyer-Related Entities harmless from and against any and all claims, suits, charges, complaints, demands, grievances, proceedings, losses, expenses, damages, obligations and liabilities

(including costs of collection, attorney fees and other defense costs or disbursements) arising out of or otherwise in respect of any failure of Seller to comply with its obligations (including, but not limited to, any statutory or contractual obligations) with respect to the Employees prior to the Closing Date.

(d)     WARN Act.  Buyer shall not, at the Property at any time within the ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff," as those terms are defined in the WARN Act, affecting in whole or in part any site of employment, facility, operating unit or Employee.  In addition, Buyer shall provide a full defense to, and indemnify Seller and the Manager for any claims, suits, charges, complaints, demands, grievances, proceedings, losses, expenses, damages, obligations and liabilities (including costs of collection, attorney fees and other defense costs or disbursements) which Seller or Manager may incur in connection with any suit or claim of violation brought against or affecting Seller or the Manager under the WARN Act for any actions taken by Buyer (or its manager) with regard to any site of employment, facility, operating unit or employee affected by this Agreement, including but not limited to liability under the WARN Act that arises in whole or in part as a result of any "employment loss", as that term is defined in the WARN Act, which was caused by Buyer in such ninety (90) day period following the Closing Date.

(e)     No Third Party Beneficiaries.  Nothing in this Article XIV shall create any third-party beneficiary rights for the benefit of any employees of the Property or the Manager.  Buyer and Seller acknowledge that all provisions contained in Article XIV with respect to employees are included for the sole benefit of Buyer (and Buyer's Affiliates, as applicable) and Seller (and Seller's Affiliates, as applicable) and shall not be deemed to constitute an amendment to any employee benefit plan or create any right (i) in any other person, including any employees, former employees, or any beneficiary thereof or (ii) to continued employment with Buyer or any of its Affiliates, managers or contractors following the Closing Date.

(f)     Survival.  The provisions of this Section 14.1 shall survive the Closing without limitation.

## ARTICLE XV

## MISCELLANEOUS

Section 15.1   Exculpation.

(a)     Notwithstanding anything to the contrary contained herein, Seller's shareholders, partners, members, the partners or members of such partners or members, the shareholders of such partners or members, and the trustees, officers, directors, employees, agents and security holders of Seller and the partners or members of Seller assume no personal liability for any obligations entered into on behalf of Seller and its individual assets shall not be subject to any claims of any person relating to such obligations.  The foregoing shall govern any direct and indirect obligations of Seller under this Agreement.

(b)     Notwithstanding anything to the contrary contained herein, Buyer's shareholders, partners, members, the partners or members of such partners or members, the

shareholders of such partners or members, and the trustees, officers, directors, employees, agents and security holders of Buyer and the partners or members of Buyer assume no personal liability for any obligations entered into on behalf of Buyer and its individual assets shall not be subject to any claims of any person relating to such obligations. The foregoing shall govern any direct and indirect obligations of Buyer under this Agreement.

        Section 15.2   Brokers. Buyer and Seller shall each pay one-half (1/2) of the $2.5% commission to Yvonne Berry.

        (a)    Seller represents and warrants to Buyer that it has dealt with no broker, salesman, finder or consultant other than Yvonne Berry (a "Seller's Broker") with respect to this Agreement or the transactions contemplated hereby. Seller agrees to indemnify, protect, defend and hold Buyer harmless from and against all claims, losses, damages, liabilities, costs, expenses (including reasonable attorneys' fees and disbursements) and charges resulting from Seller's breach of the foregoing representation in this Section 15.2(a). The provisions of this Section 15.2(a) shall survive the Closing and any termination of this Agreement.

        (b)    Buyer represents and warrants to Seller that it has dealt with no broker, salesman, finder or consultant other than Yvonne Berry, (a "Buyer's Consultant") and Seller's Broker with respect to this Agreement or the transactions contemplated hereby. Buyer agrees to indemnify, protect, defend and hold Seller harmless from and against all claims, losses, damages, liabilities, costs, expenses (including reasonable attorneys' fees and disbursements) and charges in connection with any amounts payable by Buyer to Buyer's Consultant and Seller's Broker with respect to this Agreement or the transactions contemplated hereby. The provisions of this Section 15.2(b) shall survive the Closing and any termination of this Agreement.

        Section 15.3   Confidentiality; Press Release; IRS Reporting Requirements.

        (a)    From and after (but in no event before) the Closing, Seller or Buyer may issue a press release with respect to this Agreement and the transactions contemplated hereby, provided that the content of any such press release shall be subject to the prior written consent of the other party hereto and in no event shall any such press release (i) disclose the identity of Seller's direct or indirect beneficial owners by name, unless issued by Seller, or (ii) the consideration paid for the Assets or any other economic terms hereof.

        (b)    For the purpose of complying with any information reporting requirements or other rules and regulations of the IRS that are or may become applicable as a result of or in connection with the transaction contemplated by this Agreement, including, but not limited to, any requirements set forth in proposed Income Tax Regulation Section 1.6045-4 and any final or successor version thereof (collectively, the "IRS Reporting Requirements"), Seller and Buyer hereby designate and appoint the Escrow Agent to act as the "Reporting Person" (as that term is defined in the IRS Reporting Requirements) to be responsible for complying with any IRS Reporting Requirements. The Escrow Agent hereby acknowledges and accepts such designation and appointment and agrees to fully comply with any IRS Reporting Requirements that are or may become applicable as a result of or in connection with the transaction contemplated by this Agreement. Without limiting the responsibility and obligations of the Escrow Agent as the Reporting Person, Seller and Buyer hereby agree to comply with any provisions of the IRS

Reporting Requirements that are not identified therein as the responsibility of the Reporting Person.

Section 15.4    Escrow Provisions.

(a)    The Escrow Agent shall hold the Earnest Money in escrow in an interest-bearing bank account (the "Escrow Account").

(b)    The Escrow Agent shall hold the Earnest Money in escrow in the Escrow Account until the Closing or sooner termination of this Agreement and shall hold or apply such proceeds in accordance with the terms of this Section 15.4(b).  Seller and Buyer understand that no interest is earned on the Earnest Money during the time it takes to transfer into and out of the Escrow Account.  At Closing, the Earnest Money shall be paid by the Escrow Agent to, or at the direction of, Seller.  If for any reason the Closing does not occur and either party makes a written demand upon the Escrow Agent for payment of such amount, the Escrow Agent shall, within twenty-four (24) hours give written notice to the other party of such demand.  If the Escrow Agent does not receive a written objection within five (5) Business Days after the giving of such notice, the Escrow Agent is hereby authorized to make such payment.  If the Escrow Agent does receive such written objection within such five (5) Business Day period or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, the Escrow Agent shall continue to hold such amount until otherwise directed by joint written instructions from the parties to this Agreement or a final judgment of a court of competent jurisdiction.  However, the Escrow Agent shall have the right at any time to deposit the Earnest Money with the clerk of the Phoenix District of the United States Bankruptcy Court.  The Escrow Agent shall give written notice of such deposit to Seller and Buyer.  Upon such deposit the Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(c)    The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and the Escrow Agent shall not be liable to either of the parties for any act or omission on its part, other than for its gross negligence or willful misconduct.

(d)    The Escrow Agent has acknowledged its agreement to these provisions by signing this Agreement in the place indicated following the signatures of Seller and Buyer.

Section 15.5    Successors and Assigns; No Third-Party Beneficiaries.    The stipulations, terms, covenants and agreements contained in this Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective permitted successors and assigns (including any successor entity after a public offering of stock, merger, consolidation, purchase or other similar transaction involving a party hereto) and nothing herein expressed or implied shall give or be construed to give to any person or entity, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

Section 15.6    Assignment.

(a)    This Agreement may not be assigned by Buyer without the prior written consent of Seller, which consent shall not be unreasonably withheld.  Any transfer of direct or

indirect interests in Buyer shall be deemed to be an assignment of this Agreement by Buyer. Notwithstanding the foregoing, Buyer may assign this Agreement and Buyer's rights and obligations arising hereunder to an Affiliate of Buyer without prior consent of the Seller, provided that Buyer will continue to remain primarily liable under this Agreement notwithstanding any such assignment.

(b)     This Agreement may be assigned by Seller to any Lender as collateral under any loan which encumbers the Property.

Section 15.7    Further Assurances.  From time to time, as and when requested by any party hereto, the other party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement.  This Section 15.7 shall survive until sixty (60) days after the Closing.

Section 15.8    Notices.  All notices, demands or requests made pursuant to, under or by virtue of this Agreement must be in writing and shall be (i) personally delivered, (ii) delivered by express mail, Federal Express or other comparable overnight courier service, (iii) telecopied, with telephone confirmation within one Business Day, or (iv) sent by electronic mail, with telephone or written confirmation within one Business Day, as follows:

(a) To Seller:

HOTEL OXYGEN MIDTOWN I LLC
David Valade
3600 N. 2nd Avenue
Phoenix AZ 85013
Telephone: 480-236-2712
Email:  David@oxygenhospitality.com

with copy to:

D. Lamar Hawkins
Guidant Law, PLC
402 East Southern Avenue
Tempe, AZ 85282
Telephone:602 -888-9229
Email:lamar@guidant.law

(b) If to Buyer:

AMAZING HOSPITALITY GROUP, LLC
210 NW 17th Avenue, Suite 210
Portland, OR 97209
Attention: Jeff Fleming
Telephone:  (503) 830-9630

Email: jfleming@amazinghospitalitygroup.com

(c) To the Escrow Agent or the Title Company:

> Thomas Title and Escrow
> 7150 E Camelback Rd Suite 195
> Scottsdale, AZ 85255
> Attention: Cathy L. Criner
> Email: CCriner@thomastitle.com
> Telephone: (480) 317-0319

(d)    All notices (A) shall be deemed to have been given on the date that the same shall have been delivered in accordance with the provisions of this Section (and not when written confirmation is delivered in the case of (iii) and (iv) above) and (B) may be given either by a party or by such party's attorneys.  Any party may, from time to time, specify as its address for purposes of this Agreement any other address upon the giving of ten (10) days' prior notice thereof to the other parties.

Section 15.9    Entire Agreement.  This Agreement, along with the Exhibits and Schedules hereto contains all of the terms agreed upon between the parties hereto with respect to the subject matter hereof, and all understandings and agreements heretofore had or made among the parties hereto are merged in this Agreement which alone fully and completely expresses the agreement of the parties hereto.

Section 15.10    Amendments.  This Agreement may not be amended, modified, supplemented or terminated, nor may any of the obligations of Seller or Buyer hereunder be waived, except by written agreement executed by the party or parties to be charged.

Section 15.11    No Waiver.  No waiver by either party of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

Section 15.12    Governing Law.  This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of Arizona.

Section 15.13    Submission to Jurisdiction.  Buyer and Seller each irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Arizona for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby.  Buyer and Seller each further agree that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Arizona with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence.  Buyer and Seller each irrevocably and unconditionally waive trial by jury and irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States Bankruptcy Court for the District of Arizona, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that

any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 15.14 <u>Severability</u>. If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Section 15.15 <u>Section Headings</u>. The headings of the various Sections of this Agreement have been inserted only for purposes of convenience, are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.

Section 15.16 <u>Counterparts</u>. This Agreement may be executed in two or more electronic (i.e., PDF) counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

Section 15.17 <u>Acceptance of Deed</u>. The acceptance of the Deed by Buyer shall be deemed full compliance by Seller of all of Seller's obligations under this Agreement except for those obligations of Seller which are specifically stated to survive the delivery of the Deed or the Closing hereunder.

Section 15.18 <u>Recordation</u>. Except as set forth in this Agreement and except for the Assignment of Lease (Exhibit D), neither this Agreement nor any memorandum or notice of this Agreement may be recorded by any party hereto without the prior written consent of the other party hereto. The provisions of this Section shall survive the Closing or any termination of this Agreement.

Section 15.19 <u>Guest Baggage and Safe Deposit Boxes</u>.

(a)     <u>Property of Guests</u>. All baggage, parcels or property checked or left in the care of Seller by current guests or Tenants as of the Cut-Off Time, or by those formerly staying at any of the Property, or others, shall be sealed and listed in an inventory prepared jointly by representatives of Seller and Buyer as of the Cut-Off Time and initialed and exchanged by such representatives. Possession and control of all such other baggage, parcels or property listed on such inventory shall be delivered to Buyer on the Closing Date and Buyer shall be responsible from and after the Cut-Off Time for the liability of all items listed in such inventory, but only in the condition actually delivered by Seller.

(b)     <u>Notice to Persons With Safe Deposit Boxes</u>. On the Closing Date, Seller shall give written notices ("<u>Seller Verification Notices</u>") to guests, Tenants, and other persons who have safe deposit boxes at the Property or who have deposited items in the house safe at the Property (the "<u>Depositors</u>"), if any, advising them of the sale of the Property to Buyer and requesting, within 48 hours, verification of the contents of their safe deposit boxes and/or the

house safe and either (i) removal of such contents, or (ii) if such Depositors desire to have the continued use of the safe deposit boxes and/or the house safe, the execution of a new agreement with Buyer for such continued use. Copies of Seller Verification Notices shall be given to Buyer. During said 48-hour period, each safe deposit box and/or the house safe shall be opened and the items therein recorded only in the presence of representatives of both Seller and Buyer. If the Depositors desire to continue to use a safe deposit box and/or the house safe, Buyer shall make arrangements for such continued use. The contents of all safe deposit boxes and/or the house safe of Depositors not responding to Seller Verification Notices shall be opened promptly after the expiration of the 48-hour period, but only in the presence of both Seller and Buyer. The contents of all boxes so opened shall be listed in an inventory at the time such safe deposit boxes or house safe are opened, each such list shall be signed by the representatives of Seller and Buyer, the keys and/or combinations to the boxes shall be delivered to Buyer, and the boxes shall then be relocked, sealed and left in the possession of Buyer. Seller hereby agrees to indemnify and hold Buyer harmless from and against any liability based on damage occurring prior to the date of Closing which is verified and recorded on the date of Closing.

Section 15.20 Bulk Sales Laws. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Applicable Laws of the State of Arizona that may otherwise be applicable with respect to the sale of any or all of the Assets to Buyer.

Section 15.21 Survival.

(a) Any obligations or liabilities of Seller or Buyer hereunder shall survive the Closing Date or termination of this Agreement only to the extent expressly provided herein.

(b) Unless expressly stated otherwise, all terms and provisions contained in this Agreement shall not survive the Closing.

Section 15.22 TIME IS OF THE ESSENCE. THE SELLER AND BUYER AGREE THAT TIME IS OF THE ESSENCE WITH RESPECT TO THE OBLIGATIONS OF THE BUYER UNDER THIS AGREEMENT.

Section 15.23 Waiver of Jury Trial. The Seller and Buyer hereby irrevocably waive trial by jury in any action, proceeding or counterclaim brought by one party against another party on any matter arising out of or in any way connected with this Agreement.

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

**SELLER:**

HOTEL OXYGEN MIDTOWN I LLC,
a Delaware limited liability company

By: _____
Name: David Valade
Title: Manager

3/23/2020

**BUYER:**

AMAZING HOSPITALITY GROUP, LLC,
an Oregon limited liability company

By: _____
Name: Jeff Fleming
Title: Manager

3-23-2020

51

## JOINDER BY ESCROW AGENT

Thomas Title and Escrow LLC, referred to in this Agreement as the "Escrow Agent," hereby acknowledges that it received this Agreement executed by Seller and Buyer as of the ____ day of _____, 2020, and accepts the obligations of the Escrow Agent as set forth herein.


Thomas Title and Escrow LLC


By: _____
        Name:  Cathy Criner
        Title: Vice President

*"Schedule A"*

All of those lots or parcels of land located in Maricopa County, Arizona and being more particularly described as follows:

PARCEL NO. 1:

A PORTION OF LOTS 1 AND 2, OF HOLIDAY INN - PHOENIX FINANCIAL CENTER, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 290 OF MAPS, PAGE 39, LYING WITHIN THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 2;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 63.00 FEET ALONG THE WEST LINE OF SAID LOT 2 TO THE POINT OF BEGINNING;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 556.99 FEET, CONTINUING ALONG THE WEST LINE OF SAID LOT 2 AND THE WEST LINE OF SAID LOT 1 TO THE WESTERLY MOST NORTHWEST CORNER OF SAID LOT 1;

THENCE EASTERLY AND NORTHERLY ALONG THE NORTHERLY LINES OF SAID LOT 1, THE FOLLOWING THREE COURSES AND DISTANCES:

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 132.00 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 40.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 149.00 FEET TO THE NORTHEAST CORNER OF SAID LOT 1;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, A DISTANCE OF 485.14 FEET ALONG THE EAST LINE OF SAID LOT 1;

THENCE SOUTH 89 DEGREES 24 MINUTES 30 SECONDS WEST, A DISTANCE OF 82.01 FEET;

THENCE NORTH 00 DEGREES 19 MINUTES 09 SECONDS WEST, A DISTANCE OF 0.35 FEET;

THENCE SOUTH 89 DEGREES 40 MINUTES 51 SECONDS WEST, A DISTANCE OF 52.98 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, A DISTANCE OF 111.06 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 146.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 2:

A NONEXCLUSIVE EASEMENT FOR MAINTAINING AND OPERATING AN OUTDOOR SIGN ON, OVER AND UPON AND FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 91.01 FEET ALONG THE MONUMENT LINE OF 2ND AVENUE;

THENCE SOUTH 89 DEGREES 21 MINUTES 44 SECONDS WEST, 30.00 FEET TO A LINE WHICH IS 30.00 FEET WEST OF AND PARALLEL WITH THE MONUMENT LINE OF SAID 2ND AVENUE AND THE POINT OF BEGINNING;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 29.67 FEET ALONG SAID PARALLEL LINE;

THENCE SOUTH 44 DEGREES 40 MINUTES 52 SECONDS WEST, 15.47 FEET TO A LINE WHICH IS 41.00 FEET WEST OF AND PARALLEL WITH THE MONUMENT LINE OF SAID 2ND AVENUE;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 40.55 FEET ALONG SAID PARALLEL LINE;

THENCE NORTH 89 DEGREES 21 MINUTES 44 SECONDS EAST, 11.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 3:

A NONEXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ACCESS FOR THE DELIVERY OF GOODS AND MATERIALS OVER THE FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 82.91 FEET ALONG THE MONUMENT LINE OF OSBORN ROAD;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, 40.00 FEET TO THE NORTH LINE OF THE SOUTH 40.00 FEET OF SAID NORTHWEST QUARTER AND THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, 6.89 FEET;

THENCE NORTH 45 DEGREES 00 MINUTES 00 SECONDS WEST, 21.37 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 184.66 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 20.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 97.00 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 21.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 20.00 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 21.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 76.17 FEET;

THENCE SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST, 46.43 FEET;

THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, 9.17 FEET TO THE NORTH LINE OF SAID SOUTH 40.00 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 26.00 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

PARCEL NO. 4:

A NONEXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ACCESS OVER THE FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 308.00 FEET ALONG THE MONUMENT LINE OF OSBORN ROAD;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 40.00 FEET TO THE NORTH LINE OF THE SOUTH 40.00 FEET OF SAID NORTHWEST QUARTER AND THE POINT OF BEGINNING;

*"Schedule A" Continued*

THENCE CONTINUING NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 63.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 26.00 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 63.00 FEET TO THE NORTH LINE OF SAID SOUTH 40.00 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 26.00 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

*"Schedule a 1.1"*

Assumed Contracts

Wyndham Garden Franchise Agreement
Talisker Second Osborn LLC

*"Schedule 1.1(b)"*

Survey

Attached is the Alta Commitment for Title Survey

*"Schedule 2.1(c)"*

Required Governmental Authority Consents

Any consents as may be required from any governmental authority in connection with the assignment of the Licenses and Permits.

*"Schedule 3.1(d)"*

Required Third-Party Consents

Wyndham Garden Franchise Agreement
Talisker Second Osborn LLC
Gibralter Sunshine GL, LLC (approval of recordable lease assignment and release of Seller).

*Schedule 3.2(a)"*

<u>Material Contracts</u>

Opera
Wyndham Garden Franchise Agreement
Talisker Second Osborn LLC

*Schedule 3.2(b)"*

<u>Space Leases</u>

There is a permanent easement with the Ramada Hotel adjacent to the property to use the parking structure. The easement agreement states they will share in the maintenance costs of the structure.

*Schedule 3.2(d)"*

<u>Litigation</u>

The company listing the property for sale is currently under Chapter 11 bankruptcy protection.

# EXHIBIT A

## FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES

This ASSIGNMENT AND ASSUMPTION OF LEASES ("Assignment") is made and entered into as of the day 16th of January, 2020_ between HOTEL OXYGEN MIDTOWN I LLC ("Assignor") and AMAZING HOSPITALITY GROUP, LLC ("Assignee").

## RECITALS

This Assignment is made with reference to the following facts:

A.      Concurrently with this Assignment, Assignor is selling to Assignee, and Assignee is purchasing from Assignor, all of Assignor's interest in that certain real property and related improvements, fixtures and personal property described in Exhibit A attached hereto pursuant to that certain Ground Lease Agreement dated April 2, 2007 and subsequently _____ (the "Ground Lease"), pursuant to that certain Agreement of Purchase and Sale (the "Agreement") dated _____, 2020, by and between Assignor, as seller and Assignee, as buyer.

B.      In connection with such purchase and sale, Assignor desires to assign and delegate to Assignee, and Assignee desires to assume, all of Assignor's right, title, interest, duties and obligations (to the extent such rights, duties and obligations first arise or accrue on or after the date hereof), in, to and under the various tenant leases more specifically set out in the rent roll attached hereto and made a part hereof as Exhibit B (the "Leases").

NOW, THEREFORE, in consideration of the purchase price paid by Assignee to Assignor for the Property and the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.      Assignment of Leases.  Assignor hereby assigns and delegates to Assignee, and Assignee hereby assumes, all of Assignor's right, title, interest, duties and obligations as landlord in, to and under the Leases, but only to the extent that such rights, duties and obligations first arose or accrued on or after the date hereof or to the extent that Assignee has been given a credit therefor.

2.      No Representations.   This Assignment is made without warranty or representation, express or implied, by, or recourse against, any Assignor of any kind or nature whatsoever except as expressly provided in the Agreement.  Assignee previously did its own due diligence to assure itself that it could receive the Leases with the consent of any landlord or lessor.

3.      Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4.     <u>Governing Law</u>.  This Assignment shall in all respects be governed by, and construed in accordance with, the laws of the State of Arizona.

5.     <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

6.     <u>Amendments</u>.  This Assignment shall not be altered, amended, changed, waived, terminated or otherwise modified in any respect unless the same shall be in writing and signed by or on behalf of the party to be charged therewith.

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed as of the date written above.

ASSIGNOR:

HOTEL OXYGEN MIDTOWN I LLC,
a Delaware limited liability company


By: _____
Name: David Valade
Title:  Manager


ASSIGNEE:

AMAZING HOSPITALITY GROUP, LLC
an Oregon limited liability company


By: _____
Name: Jeff Fleming
Title: Manager

# EXHIBIT A

## *"Schedule A"*

All of those lots or parcels of land located in Maricopa County, Arizona and being more particularly described as follows:

PARCEL NO. 1:

A PORTION OF LOTS 1 AND 2, OF HOLIDAY INN - PHOENIX FINANCIAL CENTER, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 290 OF MAPS, PAGE 39, LYING WITHIN THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 2;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 63.00 FEET ALONG THE WEST LINE OF SAID LOT 2 TO THE POINT OF BEGINNING;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 556.99 FEET, CONTINUING ALONG THE WEST LINE OF SAID LOT 2 AND THE WEST LINE OF SAID LOT 1 TO THE WESTERLY MOST NORTHWEST CORNER OF SAID LOT 1;

THENCE EASTERLY AND NORTHERLY ALONG THE NORTHERLY LINES OF SAID LOT 1, THE FOLLOWING THREE COURSES AND DISTANCES:

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 132.00 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 40.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 149.00 FEET TO THE NORTHEAST CORNER OF SAID LOT 1;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, A DISTANCE OF 485.14 FEET ALONG THE EAST LINE OF SAID LOT 1;

THENCE SOUTH 89 DEGREES 24 MINUTES 30 SECONDS WEST, A DISTANCE OF 82.01 FEET;

THENCE NORTH 00 DEGREES 19 MINUTES 09 SECONDS WEST, A DISTANCE OF 0.35 FEET;

THENCE SOUTH 89 DEGREES 40 MINUTES 51 SECONDS WEST, A DISTANCE OF 52.98 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, A DISTANCE OF 111.06 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 146.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 2:

A NONEXCLUSIVE EASEMENT FOR MAINTAINING AND OPERATING AN OUTDOOR SIGN ON, OVER AND UPON AND FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 91.01 FEET ALONG THE MONUMENT LINE OF 2ND AVENUE;

THENCE SOUTH 89 DEGREES 21 MINUTES 44 SECONDS WEST, 30.00 FEET TO A LINE WHICH IS 30.00 FEET WEST OF AND PARALLEL WITH THE MONUMENT LINE OF SAID 2ND AVENUE AND THE POINT OF BEGINNING;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 29.67 FEET ALONG SAID PARALLEL LINE;

THENCE SOUTH 44 DEGREES 40 MINUTES 52 SECONDS WEST, 15.47 FEET TO A LINE WHICH IS 41.00 FEET WEST OF AND PARALLEL WITH THE MONUMENT LINE OF SAID 2ND AVENUE;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 40.55 FEET ALONG SAID PARALLEL LINE;

THENCE NORTH 89 DEGREES 21 MINUTES 44 SECONDS EAST, 11.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 3:

A NONEXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ACCESS FOR THE DELIVERY OF GOODS AND MATERIALS OVER THE FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 82.91 FEET ALONG THE MONUMENT LINE OF OSBORN ROAD;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, 40.00 FEET TO THE NORTH LINE OF THE SOUTH 40.00 FEET OF SAID NORTHWEST QUARTER AND THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, 6.89 FEET;

THENCE NORTH 45 DEGREES 00 MINUTES 00 SECONDS WEST, 21.37 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 184.66 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 20.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 97.00 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 21.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 20.00 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 21.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 76.17 FEET;

THENCE SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST, 46.43 FEET;

THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, 9.17 FEET TO THE NORTH LINE OF SAID SOUTH 40.00 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 26.00 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

PARCEL NO. 4:

A NONEXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ACCESS OVER THE FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 308.00 FEET ALONG THE MONUMENT LINE OF OSBORN ROAD;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 40.00 FEET TO THE NORTH LINE OF THE SOUTH 40.00 FEET OF SAID NORTHWEST QUARTER AND THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 63.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 26.00 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 63.00 FEET TO THE NORTH LINE OF SAID SOUTH 40.00 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 26.00 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

## EXHIBIT B
## ASSIGNMENT OF CONTRACTS, BOOKINGS, LICENSES, PERMITS, WARRANTIES AND GENERAL INTANGIBLES

Booking.com
Cox Business
Expedia
In Room Connection
Talisker Second Osborn LLC

**EXHIBIT C**
**FORM OF TENANT NOTICE**

HOTEL OXYGEN MIDTOWN I, LLC
DBA Wyndham Garden Midtown
3600 N. 2nd Avenue
Phoenix AZ 85013

January 16, 2020

**VIA UPS/CERTIFIED MAIL**

_____

_____

_____

Attn: _____

Re:  Notice to Tenants of the _____ (the "Premises");

Dear Vendor:

Please be advised that effective February 1, 2020 conveyed the Premises to AMAZING HOSPITALITY GROUP, LLC.  As part of this transaction, your Contract was assigned by Hotel Oxygen Midtown I to AMAZING HOSPITALITY GROUP, LLC ("New Owner").  A copy of the Assignment and Assumption of Leases, Assignment and Assumption of Lease and W-9 are enclosed for your reference.  The purpose of this letter is to inform you of this transaction and the impact on your Lease.

 All, charges under the Lease from and after February 1, 2020 are to be made payable to TG Hospitality] and be paid to the following address:

AMAZING HOSPITALITY GROUP, LLC
210 NW 17th Avenue, Suite 210
Portland, OR 97209
Attention: Jeff Fleming
Telephone:  (503) 830-9630
Email: jfleming@amazinghospitalitygroup.com

Please note that the address listed on the W-9 is the tax filing address for your landlord and not the address to be used for your rental payments and other charges.

**Due to this change in ownership you may receive multiple quarterly account statements. Each quarterly account statement will detail balances open (credits and/or charges)**

**relating to the respective owner's period of ownership and should be combined to produce the current balance on your account.**

      I.     <u>Notices and Correspondence</u>.   All notices and correspondence (other than insurance certificates and sales reports) should be sent to New Owner at the following address:

                 AMAZING HOSPITALITY GROUP, LLC
                 210 NW 17th Avenue, Suite 210
                 Portland, OR 97209
                 Attention: Jeff Fleming
                 Telephone:  (503) 830-9630
                 Email: jfleming@amazinghospitalitygroup.com

      II.     <u>Insurance</u>.  You are hereby requested to have the insurance policies required under the Lease amended to add [BUYER ENTITY] as additional insured thereunder and have a certificate of insurance indicating such amendment forwarded to [BUYER ENTITY].

All certificates of insurance should be addressed to:

                 AMAZING HOSPITALITY GROUP, LLC
                 210 NW 17th Avenue, Suite 210
                 Portland, OR 97209
                 Attention: Jeff Fleming
                 Telephone:  (503) 830-9630
                 Email: jfleming@amazinghospitalitygroup.com

      III.    <u>Security Deposit</u>.  The security deposit paid by you to [_____] has been transferred to the New Owner and the New Owner shall be responsible for holding the same in accordance with the terms of the Lease.

      IV.    <u>Personnel</u>.  Finally, if you have specific questions, please feel free to contact any of the following persons:

                 AMAZING HOSPITALITY GROUP, LLC
                 210 NW 17th Avenue, Suite 210
                 Portland, OR 97209
                 Attention: Jeff Fleming
                 Telephone:  (503) 830-9630
                 Email: jflemming@amazinghospitalitygroup.com

We appreciate your patience and cooperation during this transition.

**SELLER**:

HOTEL OXYGEN MIDTOWN I, LLC,
a Delaware limited liability company


By: _____
Name: David Valade
Title:  Manager


**BUYER**:

AMAZING HOSPITALITY GROUP, LLC
an Oregon limited liability company


By: _____
Name: Jeff Fleming
Title: Manager

**EXHIBIT D**

**FORM OF ASSIGNMENT OF LAND LEASE**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:
Hotel Oxygen Midtown I, LLC
c/o Guidant Law, PLC
2390 E. Camelback Road, Suite 318
Phoenix, Arizona 85016
Attn. J. Phillip Glasscock, Esq.

SPACE ABOVE FOR RECORDER'S USE

**ASSIGNMENT AND ASSUMPTION
OF LAND LEASE AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION OF LAND LEASE AGREEMENT ("Agreement") is made and entered into this _____ day of _____, 2020, by and between **HOTEL OXYGEN MIDTOWN I, LLC**, a Delaware limited liability company ("Assignor") with an address of _____and **AMAZING HOSPITALITY GROUP, LLC**, an Oregon limited liability company, ("Assignee") with an address of _____.

**RECITALS**

WHEREAS, Assignor, as Tenant, and _____, a _____ limited liability company, as Landlord entered into that certain _____ Ground Lease Agreement dated April 2, 2007, (collectively the "Lease") pursuant to which Landlord agreed to lease to Assignor certain premises commonly known as 3600 North 2nd Avenue, Phoenix, Maricopa County, Arizona and more specifically described in Exhibit "A" attached hereto; and,

WHEREAS, Landlord has provided its written consent dated _____ to an Assignment of said Lease by Assignor to Assignee; and,

WHEREAS, Assignor desires to assign all of its right, title and interest in the Lease to Assignee and Assignee desires to assume Assignor's obligations under the Lease.

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Lease Assignment between Hotel Oxygen Midtown I, LLC, and Amazing Hospitality Group, LLC
     Page 1

1. <u>Assignment</u>. Subject to and concurrently with the consummation of that certain Agreement of Purchase and Sale dated January _____, 2020 (the "Agreement"), Assignor hereby assigns to Assignee and Assignor hereby accepts from Assignee all of Assignor's right, title and interest in and to the Lease including any and all prepaids and other rights or entitlements of Assignor under the Lease, subject to all of the terms, covenants, conditions and provisions of the Lease. All provisions of the Lease are incorporated herein by reference.

2. <u>Assumption</u>. From and after the date hereof, Assignee hereby assumes, covenants and agrees to keep and perform each and every obligation of Assignor under the Lease. Assignee agrees to be bound by each and every provision of the Lease as if it had executed the same.

3. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

4. <u>Successors and Assigns</u>. This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of the successors and assigns of the parties.


     IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

ASSIGNOR:                                          ASSIGNEE:

**HOTEL OXYGEN MIDTOWN I, LLC,**          **AMAZING HOSPITALITY GROUP,**
**LLC**,
a Delaware limited liability company          an Oregon limited liability company



By:_____      By:_____
Name: David Valade                                 Name: Jeff Fleming
Title: Manager                                        Title: Manager

     IN WITNESS WHEREOF, the foregoing Assignment and Assumption of Lease Agreement is hereby approved by the Landlord, Gibralter Sunshine GL, LLC. For good and valuable consideration, Gibralter Sunshine GL, LLC hereby releases Hotel Oxygen Midtown I, LLC from any and all of its obligations under the Lease.

**GIBRALTER SUNSHINE GL, LLC,**
a Delaware limited liability company



By:_____
Name: _____
Title: Manager

Lease Assignment between Hotel Oxygen Midtown I, LLC, and Amazing Hospitality Group, LLC
    Page 21

STATE OF ARIZONA        )
                                    )ss.
COUNTY OF MARICOPA   )

On the _____ day of _____, 2020, before me, a Notary Public in and for the above state and county, personally appeared **DAVID VALADE**, known to me or proved to be the person named in and who executed the foregoing instrument, and being first duly sworn, such person acknowledged that he or she executed said instrument for the purposes therein contained as his or her free and voluntary act and deed.

_____
NOTARY PUBLIC

My Commission Expires:

STATE OF ARIZONA        )
                                    )ss.
COUNTY OF MARICOPA   )

On the _____ day of _____, 2020, before me, a Notary Public in and for the above state and county, personally appeared **Jeff Fleming**, known to me or proved to be the person named in and who executed the foregoing instrument, and being first duly sworn, such person acknowledged that he or she executed said instrument for the purposes therein contained as his or her free and voluntary act and deed.

_____
NOTARY PUBLIC

My Commission Expires:

STATE OF ARIZONA        )
                                    )ss.
COUNTY OF MARICOPA   )

On the _____ day of _____, 2020, before me, a Notary Public in and for the above state and county, personally appeared _____, known to me or proved to be the person named in and who executed the foregoing instrument, and being first duly sworn, such person acknowledged that he or she executed said instrument for the purposes therein contained as his or her free and voluntary act and deed.

_____
NOTARY PUBLIC

My Commission Expires:

Lease Assignment between Hotel Oxygen Midtown I, LLC, and Amazing Hospitality Group, LLC
     Page 22

EXHIBIT "A"

LEGAL DESCRIPTION

(to be confirmed by Escrow Agent)

All of those lots or parcels of land located in Maricopa County, Arizona and being more particularly described as follows:

PARCEL NO. 1:

A PORTION OF LOTS 1 AND 2, OF HOLIDAY INN - PHOENIX FINANCIAL CENTER, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 290 OF MAPS, PAGE 39, LYING WITHIN THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 2;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 63.00 FEET ALONG THE WEST LINE OF SAID LOT 2 TO THE POINT OF BEGINNING;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 556.99 FEET, CONTINUING ALONG THE WEST LINE OF SAID LOT 2 AND THE WEST LINE OF SAID LOT 1 TO THE WESTERLY MOST NORTHWEST CORNER OF SAID LOT 1;

THENCE EASTERLY AND NORTHERLY ALONG THE NORTHERLY LINES OF SAID LOT 1, THE FOLLOWING THREE COURSES AND DISTANCES:

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 132.00 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, A DISTANCE OF 40.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 149.00 FEET TO THE NORTHEAST CORNER OF SAID LOT 1;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, A DISTANCE OF 485.14 FEET ALONG THE EAST LINE OF SAID LOT 1;

THENCE SOUTH 89 DEGREES 24 MINUTES 30 SECONDS WEST, A DISTANCE OF 82.01 FEET;

THENCE NORTH 00 DEGREES 19 MINUTES 09 SECONDS WEST, A DISTANCE OF 0.35 FEET;

THENCE SOUTH 89 DEGREES 40 MINUTES 51 SECONDS WEST, A DISTANCE OF 52.98 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, A DISTANCE OF 111.06 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 146.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 2:

A NONEXCLUSIVE EASEMENT FOR MAINTAINING AND OPERATING AN OUTDOOR SIGN ON, OVER AND UPON AND FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 91.01 FEET ALONG THE MONUMENT LINE OF 2ND AVENUE;

THENCE SOUTH 89 DEGREES 21 MINUTES 44 SECONDS WEST, 30.00 FEET TO A LINE WHICH IS 30.00 FEET WEST OF AND PARALLEL WITH

THE MONUMENT LINE OF SAID 2ND AVENUE AND THE POINT OF BEGINNING;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 29.67 FEET ALONG SAID PARALLEL LINE;

THENCE SOUTH 44 DEGREES 40 MINUTES 52 SECONDS WEST, 15.47 FEET TO A LINE WHICH IS 41.00 FEET WEST OF AND PARALLEL WITH THE MONUMENT LINE OF SAID 2ND AVENUE;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 40.55 FEET ALONG SAID PARALLEL LINE;

THENCE NORTH 89 DEGREES 21 MINUTES 44 SECONDS EAST, 11.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 3:

A NONEXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ACCESS FOR THE DELIVERY OF GOODS AND MATERIALS OVER THE FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 82.91 FEET ALONG THE MONUMENT LINE OF OSBORN ROAD;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, 40.00 FEET TO THE NORTH LINE OF THE SOUTH 40.00 FEET OF SAID NORTHWEST QUARTER AND THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, 6.89 FEET;

THENCE NORTH 45 DEGREES 00 MINUTES 00 SECONDS WEST, 21.37 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 184.66 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 20.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 97.00 FEET;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 21.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 20.00 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 21.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 76.17 FEET;

THENCE SOUTH 45 DEGREES 00 MINUTES 00 SECONDS EAST, 46.43 FEET;

THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, 9.17 FEET TO THE NORTH LINE OF SAID SOUTH 40.00 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 26.00 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

PARCEL NO. 4:

A NONEXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ACCESS OVER THE FOLLOWING DESCRIBED PARCEL:

A PORTION OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 2ND AVENUE AND OSBORN ROAD FROM WHICH A CITY OF PHOENIX BRASS CAP IN HANDHOLE AT THE INTERSECTION OF 3RD AVENUE AND OSBORN ROAD BEARS SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 520.14 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 308.00 FEET ALONG THE MONUMENT LINE OF OSBORN ROAD;

THENCE NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 40.00 FEET TO THE NORTH LINE OF THE SOUTH 40.00 FEET OF SAID NORTHWEST QUARTER AND THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 00 DEGREES 38 MINUTES 16 SECONDS WEST, 63.00 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 26.00 FEET;

THENCE SOUTH 00 DEGREES 38 MINUTES 16 SECONDS EAST, 63.00 FEET TO THE NORTH LINE OF SAID SOUTH 40.00 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 26.00 FEET ALONG SAID NORTH LINE TO THE POINT OF BEGINNING.

<u>EXHIBIT B</u>

<u>TITLE EXCEPTIONS</u>

# EXHIBIT E

## FORM OF BILL OF SALE

This BILL OF SALE ("Bill of Sale") is made and entered into as of the 1 day of February, 2020 by HOTEL OXYGEN MIDTOWN I, LLC, a Delaware limited liability company ("Seller"), in favor of AMAZING HOSPITALITY GROUP, LLC, an Oregon limited liability company ("Buyer").

## RECITALS

This Bill of Sale is made with reference to the following facts:

A.     Concurrently with this Bill of Sale, Seller is selling to Buyer, and Buyer is purchasing from Seller, that leasehold interest in the real property and related improvements, fixtures and personal property described in Exhibit A attached hereto (the "Real Property"), pursuant to that certain Agreement of Purchase and Sale (the "Purchase Agreement") dated _____, 2020, by and between AMAZING HOSPITALITY GROUP, LLC, as Buyer and HOTEL OXYGEN MIDTOWN I, LLC as Seller.  Any capitalized terms used herein and not otherwise defined shall have the meaning ascribed thereto in the Purchase Agreement.

B.     In connection with such purchase and sale, Seller desires to assign and delegate to Buyer, and Buyer desires to assume, all of Seller's right, title, interest, duties and obligations (to the extent such rights, duties and obligations first arise or accrue on or after the date hereof), in, to and under various personal property and other rights pertaining to the Real Property and its operation.

NOW, THEREFORE, in consideration of the purchase price paid by Buyer to Seller for the Real Property and the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

1.     Sale of Personal Property.  Seller hereby sells, transfers, sets over and conveys to Buyer the following (the "Transferred Property"):

(a)     all Personal Property;

(b)     all Plans and Specifications;

(c)     all Consumables; and

(d)     all Retail Merchandise.

provided, however, in each case, that Transferred Property shall expressly exclude Assignor's right, title and interest in and to any Excluded Assets.

2.     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

3.     <u>Governing Law</u>.  This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Arizona.

4.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

[no further text on this page]

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed as of the date written above.

**SELLER**:

HOTEL OXYGEN MIDTOWN I, LLC,
a Delaware limited liability company


By: _____
Name: David Valade
Title:  Manager


**BUYER**:

AMAZING HOSPITALITY GROUP, LLC
an Oregon limited liability company


By: _____
Name: Jeff Fleming
Title: Manager

# AMENDMENT TO AGREEMENT OF PURCHASE AND SALE
by and among

HOTEL OXYGEN MIDTOWN I, LLC, as Seller

and

AMAZING HOSPITALITY GROUP, LLC, as Buyer

Dated March 3, 2020

Wyndham Garden Midtown Phoenix

This Amendment ("this Amendment") is made as of the 15th day of May, 2020 (the "Effective Date") to that certain Agreement Of Purchase And Sale dated March 3, 2020 ("the Agreement") between Hotel Oxygen Midtown I, LLC ("Seller") and Amazing Hospitality Group, LLC ("Buyer") with reference to the following recitals that are expressly made part of this Amendment. This Amendment is incorporated into the Agreement by this reference and the provisions of this Amendment supersede any provision(s), rule(s), or regulation(s) of said Agreement that are inconsistent with, or in conflict with any provisions hereof regardless of whether the inconsistent section of the Agreement is mentioned below or not. The capitalized terms herein shall have the same meanings as set forth in the Agreement. Paragraph headings are for reference only and shall have no substantive meaning.

## RECITALS:

A. The Closing Date for the transaction which is the subject of the Agreement was originally scheduled to be on May 18, 2020.

B. On the afternoon of May 12, 2020, Buyer proposed an extension of the Closing Date and other changes to the Agreement.

C. The parties have engaged in non-binding discussions regarding terms for a proposed extension of the Closing Date and other changes to the Agreement.

D. Seller and Buyer desire to amend the Agreement on the terms and conditions contained in this Amendment.

In consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1. Incorporation of Recitals. The recitals set forth above are incorporated into this Amendment as representations and covenants of the parties.

2. Additional Earnest Money and Closing Extension. In the event that the Closing does not occur by June 1, 2020, then the Buyer shall deposit $200,000.00 with the Escrow Agent as additional nonrefundable Earnest Money, and the Closing Date shall be extended to June 22, 2020.

Case 2:19-bk-14399-PS Doc 336 Filed 09/10/20 Entered 09/10/20 15:37:42 Desc
Main Document Page 99 of 106

In the event that the Closing occurs on or before June 22, 2020, this additional nonrefundable Earnest Money WILL be considered to be a payment towards the Purchase Price, it WILL be credited for the benefit of the Buyer's obligation to pay the Purchase Price at Closing, and the Purchase Price WILL be reduced by the amount of this additional nonrefundable Earnest Money paid to Seller at Closing.

3. <u>Agreement to Release $64,934.46 of Earnest Money from Escrow.</u>  Buyer and Seller agree that $64,934.46 of the Earnest Money shall be immediately released from Escrow and paid to the Seller's landlord per Seller's instructions.  Buyer and Seller agree to promptly take any action necessary to accomplish this partial release of Earnest Money.  This partial release of Earnest Money is in consideration for Seller agreeing to enter into this Amendment and to extend the Closing Date, and, therefore, it will NOT be considered to be a payment towards the Purchase Price, it will NOT be credited for the benefit of the Buyer's obligation to pay the Purchase Price at Closing, and the Purchase Price will NOT be reduced by the amount of this partial release of Earnest Money.

4. <u>Buyer's Acknowledgement of Seller Compliance with Agreement.</u> Buyer agrees and acknowledges that the Seller has fully complied with the terms of the Agreement and that the Seller has tendered performance of all its obligations that would be required for the Seller to completely fulfil its obligations at Closing.

5. <u>Buyer's Acceptance of Closing Documents.</u> Buyer accepts the forms of the Closing documents emailed to Buyer on May 12, 2020 subject to completion of any blanks by Escrow Agent and/or Buyer and agrees that Buyer will not object to same.

6. <u>Confirmation that Ultimate Buyer needs approval by Landlord and Franchisor.</u>  Buyer understands and agrees that it is Buyer's sole obligation under the Agreement to obtain the approval of the Buyer and its principals by the Seller's current landlord and franchisor.

7. <u>Confirmation of Unamended Agreement Terms.</u> Except as amended in this Amendment, the parties confirm the terms, covenants and conditions stated in the Agreement as if fully set forth herein.

Whereas the parties agree to the forgoing as of May 15, 2020.

SELLER:                                        BUYER:

Hotel Oxygen Midtown I, LLC, a Delaware        AMAZING HOSPITALITY GROUP, LLC,
limited liability company                      an Oregon limited liability company

By: Oxygen Hospitality Group, Inc.,
a Delaware corporation
Its: Manager

By: _____              By: _____
    David Valade                                Jeff Fleming
    Its  Chief Financial Officer                Its:  Manager

Amendment to Agreement of Purchase and Sale                                Page 2

## SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

by and among

HOTEL OXYGEN MIDTOWN I, LLC, as Seller

and

AMAZING HOSPITALITY GROUP, LLC, as Buyer

Dated March 3, 2020

Wyndham Garden Midtown Phoenix

This Amendment ("this Amendment") is made as of the 1st day of July, 2020 (the "Effective Date") to that certain Agreement Of Purchase And Sale dated March 3, 2020 ("the Agreement") between Hotel Oxygen Midtown I, LLC ("Seller") and Amazing Hospitality Group, LLC ("Buyer"), as previously amended, with reference to the following recitals that are expressly made part of this Amendment. This Amendment is incorporated into the Agreement by this reference and the provisions of this Amendment supersede any provision(s), rule(s), or regulation(s) of said Agreement that are inconsistent with, or in conflict with any provisions hereof regardless of whether the inconsistent section of the Agreement is mentioned below or not. The capitalized terms herein shall have the same meanings as set forth in the Agreement. Paragraph headings are for reference only and shall have no substantive meaning.

## RECITALS:

A.      The transaction which was the subject of the Agreement was previously cancelled and the remaining Earnest Money was distributed to the Seller.

B.      Buyer subsequently offered to revive the Agreement pursuant to a reduced Purchase Price, extend the Closing Date and deposit additional nonrefundable Earnest Money into Escrow as set forth below.

C.      Seller and Buyer desire to revive and amend the Agreement on the terms and conditions contained in this Amendment.

In consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1. <u>Incorporation of Recitals</u>.   The recitals set forth above are incorporated into this Amendment as representations and covenants of the parties.

2. <u>Reduced Purchase Price</u>.   Buyer and Seller agree that the Purchase Price shall be reduced to $2,300,000.00.

3. <u>Closing Extension</u>.   Buyer and Seller agree to extend the Closing Date to July 16, 2020.

4. <u>Agreement to Deposit Additional Earnest Money into Escrow</u>. Buyer shall deposit $200,000.00 of nonrefundable Earnest Money into Escrow on or before July 9, 2020. This additional Earnest Money will be credited towards the Purchase Price if the Buyer closes the purchase of the Property per the terms of the Agreement, as amended, on or before July 31, 2020. Earnest Money released to the Buyer or for its benefit prior to the date of this Amendment will not be credited towards to the Purchase Price.

5. <u>Buyer to Assume Cox Contract</u>. Buyer agrees to assume Seller's Cox Cable agreement for cable television and internet service to the Property.

6. <u>Court Approval Required</u>. Buyer understands and agrees that the revival of the Agreement and the terms and conditions in this Amendment are subject to the approval of the bankruptcy court. The Seller may terminate this Amendment, the Agreement, and the Escrow at no cost or liability to Seller other than return of the Earnest Money to Buyer if the Seller decides in good faith that it will likely not be able to obtain bankruptcy court approval by July 31, 2020.

7. <u>Buyer's Acknowledgement of Seller Compliance with Agreement</u>. Buyer agrees and acknowledges that the Seller has fully complied with the terms of the Agreement and that the Seller has tendered performance of all its obligations that would be required for the Seller to completely fulfil its obligations at Closing.

8. <u>Buyer's Acceptance of Closing Documents</u>. Buyer accepts the forms of the Closing documents emailed to Buyer on May 12, 2020 subject to completion of any blanks by Escrow Agent and/or Buyer and agrees that Buyer will not object to same.

9. <u>Confirmation that Ultimate Buyer needs approval by Landlord and Franchisor</u>. Buyer understands and agrees that it is Buyer's sole obligation under the Agreement to obtain the approval of the Buyer and its principals by the Seller's current landlord and franchisor.

10. <u>Confirmation of Unamended Agreement Terms</u>. Except as amended in this Amendment, the parties confirm the terms, covenants and conditions stated in the Agreement and the previous amendment as if fully set forth herein.

Whereas the parties agree to the forgoing as of July 1, 2020.

SELLER:

Hotel Oxygen Midtown I, LLC, a Delaware
limited liability company

By: Oxygen Hospitality Group, Inc.,
a Delaware corporation
Its: Manager

By: _____
    David Valade
    Its: Chief Financial Officer

BUYER:

AMAZING HOSPITALITY GROUP, LLC,
an Oregon limited liability company

By: _____
    Jeff Fleming
    Its: Manager

Second Amendment to Agreement of Purchase and Sale                     Page 2

# EXHIBIT "B"



Alan Meda, Esq.
Burch & Cracchiolo
1850 N. Central Avenue, Suite 1700
Phoenix, AZ 85004

VIA EMAIL AND REGULAR MAIL

Case:          Hotel Oxygen Midtown I, LLC ("HOMS") ; USBC (AZ) Case NO. 2:19-bk-14399

Subject:       Wyndham Hotel Midtown ("the Wyndham hotel")Sale; Mr. Brent W. Lee/Le
               Garden HB, LLC. (collectively "Mr. Lee")

Dear Alan:

This letter is the Debtors' notice to Mr. Lee of his failure to comply with his obligation to assume the Wyndham franchise agreement or make arrangements to pay all the franchise termination and other costs of the Debtors' caused by his failure to do so.  Mr. Lee was aware of his obligation to assume or pay for the termination of the franchise agreement from his contract for the purchase of the Wyndham hotel.  Also, when Mr. Lee made his bid for the purchase of the Wyndam hotel, it was understood by all parties that Mr. Lee's bid included the obligation to assume the franchise agreement.  Mr. Lee's failure to fulfill his obligations has already caused the debtor and other parties to incur unnecessary legal and other costs.  Furthermore, Mr. Lee's actions have put the Debtors in jeopardy of incurring a large administrative claim from the franchisor.

By way of background, we first learned of the existence of Mr. Lee as the purported "investor" of Amazing Hospitality Group ("AHG") for the purchase of the Wyndham earlier this year.  That transaction fell out in or about March.  We were informed that Mr. Lee was involved in a disagreement with AHG.

About that same time, we were informed that Mr. Lee or his entity was the ultimate purchaser of the Wyndham and the sale was renegotiated for a substantially lower price. The Debtors agreed to the lower price and extended closing date in exchange for the buyer agreeing that the assumption of the Talisker lease and Wyndham franchise agreement would be the buyer's sole obligation.

Despite the concessions, the named buyer, AHG, still did not close the purchase of the Wyndham hotel.  We understand that the closing did not occur because Mr. Lee was not willing to sign the personal guaranty to Talisker required to close the sale.  The debtors

were able to obtain an alternate to the guaranty, namely a $200k lease deposit to be paid to Talisker. AHG failed and refused to pay the lease deposit, but Mr. Lee decided to make a higher and better bid than AHG by agreeing to pay the lease deposit. The court accepted Mr. Lee's bid, but he also failed to perform his obligation to timely close the purchase of the Wyndham hotel.

Immediately after his bid, Mr. Lee allegedly sent an email in which he expressed his glee at obtaining the winning bid, followed by an unfortunate email to someone, which AHG incorrectly claims evidences a side deal involving the Debtors their representative, Mr. Valade. Although no such side deal exists to our knowledge, AHG used Mr. Lee's incorrect email as a basis to file a motion to set aside the sale. Mr. Lee's email cost the debtors and other parties thousands of dollars of unnecessary attorneys' fees. Fortunately, the Court denied AHG's motion and approved the sale. The closing for the sale to Mr. Lee was set for August 31.

While the debtors diligently completed their closing requirements in anticipation of the August 31 closing, Mr. Lee did not. A few days before the sale, the escrow company informed us that they were concerned that Mr. Lee had not returned his signed documents, as evidenced by the lack of tracking information available on the return label the escrow company sent Mr. Lee. After our efforts, we were informed that Mr. Lee finally signed and deposited the documents for return on the Friday before the Monday closing. We were very worried that the documents would not arrive on time for closing because of Mr. Lee's delay.

At about that same time, we were struggling with Mr. Lee's interference with the escrow agent. Specifically, Mr. Lee emailed the escrow agent claiming that he had no obligation to pay half of the sales commissions as required per the Court's sale order. The order specifically states that the debtors and Mr. Lee will each pay half of the sales commissions. We understand that Mr. Lee was not available to discuss this issue with either of his attorneys, despite the fact that he was obviously capable of communicating with third parties when it suited his needs.

While we were relieved when we learned that Mr. Lee's documents arrived on the August 31 closing date, you can imagine our frustration when we learned that Mr. Lee unilaterally crossed out both the buyer's and seller's commissions on the settlement statement. We had the unenviable job of approaching the sales agent, Yvonne Berry, with Mr. Lee's last-minute issue. Ms. Berry kindly offered to forgo the buyer's half of the commission if that was necessary to complete the sale.

Unfortunately, the sale commissions were not the only problem caused by Mr. Lee that prevented the closing. For example, the escrow agent informed us that Mr. Lee failed to provide the lease deposit required for the sale. Several attorneys spent the better part of the past two days trying to overcome the problems caused by Mr. Lee. Our efforts were

made even more difficult by what we understand was Mr. Lee's intentional refusal to communicate to his own attorneys.

Nevertheless, we continued to work to resolve the issues caused by Mr. Lee. Then, yesterday we were surprised to learn that Mr. Lee was in Phoenix. We were told that Mr. Lee checked into the Wyndham hotel as a guest with his son. Our client representative met with Mr. Lee to help him with the anticipated transition of Mr. Lee as owner of the hotel after closing.

We talked to you about one likely significant transition issue, and that is the franchise agreement. Specifically, we discussed the likely repercussions from the franchisor to the unlicensed use of its trademarks and other property by Mr. Lee if he does not assume the franchise agreement.

Despite our efforts, we still do not have a resolution of the franchise agreement assumption issue. Nevertheless, to comply with debtors' obligations under the sale order and to mitigate the debtors' damages caused by Mr. Lee, the debtors have decided to close the sale of the Wyndham hotel with a full reservation of the debtors' rights. The debtors fully intend to pursue Mr. Lee for any and all damages incurred as a result of his actions.

This letter is not meant to be a comprehensive recital of all the debtors' rights and remedies, all of which are hereby reserved. Particularly and without limitation, the debtors' closing of the sale of the Wyndham hotel pursuant to the Court's sale order does not constitute a waiver, release, or election of any of the Debtors' rights to pursue Mr. Lee for his failure to assume the franchise agreement or any other reason.

Sincerely,

J. Phillip Glasscock